UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JOEL McCLEASE, | ) | |
| JOHN BODDORF, and | ) | |
| MALCOLM JACOBS, | ) | |
|     Plaintiffs, | ) | |
| | ) | |
|     v. | ) | Case No. 2:07-cv-19-MHT |
| | ) | |
| ALABAMA DEPARTMENT | ) | |
| OF CORRECTIONS, | ) | |
|     Defendant | ) | |

<u>PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT</u>

Comes now Plaintiffs Joel McClease ("McClease"), John Boddorf ("Boddorf") and

Malcolm Jacobs ("Jacobs") to respond to the defendant's motion for summary judgment as

follows:

## I.  STATEMENT OF THE CASE

Plaintiffs, all males, are, or at all times material hereto were, employees of the Alabama

Department of Corrections ("DOC"), holding the classification of Correctional Officer I (COI),

posted at the Staton Correctional Facility ("Staton").  On April 3, 2006, McClease filed an EEOC

charge of discrimination alleging he was discriminated against in his employment based on sex.

On January 4, 2007, this lawsuit was timely filed (180 days having passed since the filing of

McClease's EEOC charge of discrimination).  Neither Plaintiff John Boddorf ("Boddorf") nor

Plaintiff Malcom Jacobs ("Jacobs") filed complaints with the EEOC; they joined this action

under the "piggybacking" doctrine.  This lawsuit alleged discrimination based on sex in their

employment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §

2000e, et seq. An amended complaint was filed on March 31, 2007, when Plaintiffs Boddorf and

Jacobs were added to this lawsuit. The defendant, in its answers, denied that it discriminated

against Plaintiffs.

## II.  STATEMENT OF MATERIAL FACTS

1.      McClease is a professional Correctional Officer with an extensive background of

satisfactory service with the Department. McClease has been employed with the

Department since August, 1989, and currently works at the Department's Staton

Correctional Facility. He works on the third shift from 10:00 p.m. to 6:00 a.m. (Def.

Exh. A, EEOC charge of discrimination, addendum, ¶ 1; Plaintiffs' Exhibit 1, McClease

depo., 20:4-20:13; 20:17-21:4).

2.      Boddorf was a professional Correctional Officer with an extensive background of

satisfactory service with the Department. Boddorf had been employed with the

Department since approximately December, 1978. Boddorf was employed at the

Department's Staton Correctional Facility. He worked on the first shift from 6:00 a.m. to

2:00 p.m. Boddorf retired as of May 1, 2007. (Plaintiffs' Exhibit 2, Boddorf depo., 5:16-

6:1; 8:16-8:23; 17:2-17:15).

3.      Jacobs is a professional Correctional Officer with an extensive background of satisfactory

service with the Department. Jacobs has been employed with the Department since 1985,

and currently works at the Department's Staton Correctional Facility. He works on the

second shift from 2:00 p.m. to 10:00 p.m. (Plaintiffs' Exhibit 3, Jacobs depo., 14:1-

14:10; 65:10-65:15; 107:11-109:6).

4.      A number of other male Correctional Officers and female Correctional Officers are also

2

employed there on each shift.  (Plaintiffs' Exhibit 5, October-2006 Personnel Rotation Chart Staton Third Shift).

5.    The female Correctional Officers are assigned more favorable and less dangerous work than are the males.  (Plaintiffs' Exhibit 1, McClease depo., 30:21-31:7; 38:1-38:4; 55:2-55:4; Plaintiffs' Exhibit 2, Boddorf depo., 41:13-41:22; 79:9-79:17; Plaintiffs' Exhibit 3, Jacobs depo., 23:9-24:6; 69:13-69:23; Plaintiffs' Exhibit 5, October-2006 Personnel Rotation Chart Staton Third Shift).

6.    Female officers are assigned to work in the C dormitory and the E dormitory, in the guard towers, and in the hospital.  Males are assigned to the A, B, D, and G dormitories.[1] (Plaintiffs' Exhibit 6, Employee Grievance, dated 10/17/05; Plaintiffs' Exhibit 7, Harassment and Discrimination Complaint Form, dated 11/22/05; Plaintiffs' Exhibit 2, Boddorf depo., 41:13-41:22; Plaintiffs' Exhibit 3, Jacobs depo., 23:9-24:6; 29:19-30:11; 69:13-69:23).

7.    The C dormitory houses inmates who are undergoing a Substance Abuse Program ("SAP"), and are generally more docile.  The E dormitory is the honor dormitory, and inmates there are the best behaved in the institution.  The hospital has fewer inmates than are housed in other areas, and they are generally more docile; moreover, there is very little actual work required in the hospital.  The towers require vigilance, but no danger, virtually no actual work, and no contact with inmates.  (Plaintiffs' Exhibit 1, McClease

---

[1]  Those were the dormitory designations at the time of the submission of the original Complaint.  Apparently the Department has now given the dormitories aliases: What was A is now D; what was B is now C; the old C is now E; the former D is now F; G has become B; E is now A; and what was H (for hospital) is now G.  Plaintiffs will continue to use the old designations as they were in effect at the origination of this action.

depo., 42:20-43:4; 112:9-112:13; Def. Exh. A, EEOC charge of discrimination, addendum, ¶ 1).

8.      The A, B, D, and G general population dormitories house more inmates, require the most work, create the most stress, and pose the most danger to Correctional Officers. (Plaintiffs' Exhibit 1, McClease depo., 53:7-53:14; Plaintiffs' Exhibit 2, Boddorf depo., 81:17-81:21; 85:14-85:19; Plaintiffs' Exhibit 3, Jacobs depo., 23:9-24:6; 24:21-26:10; 69:13-69:23; Def. Exh. A, EEOC charge of discrimination, addendum, ¶ 1).

9.      Female Correctional Officers are virtually never assigned to the A, B, D, and G dormitories.  (Plaintiffs' Exhibit 5, October-2006 Personnel Rotation Chart Staton Third Shift; Plaintiffs' Exhibit 6, Employee Grievance, dated 10/17/05; Plaintiffs' Exhibit 7, Harassment and Discrimination Complaint Form, dated 11/22/05; Plaintiffs' Exhibit 2, Boddorf depo., 41:13-41:22; 65:16-66:16).

10.      Female Correctional Officers may have been assigned (on paper) to A, B, D and G dormitories, in reality, they rarely worked those areas.  (Plaintiffs' Exhibit 2, Boddorf depo., 65:16-66:16; 72:10-72:20; 79:9-79:17; Plaintiffs' Exhibit 3, Jacobs depo., 31:4-31:12; 72:6-72:13; 74:16-75:2; 75:20-77:5; 101:4-101:6).  Duty rosters, showing on a particular day that somebody worked a particular job, were not always correct. (Plaintiffs' Exhibit 2, Boddorf depo., 84:16-84:22; 96:3-96:14; Plaintiffs' Exhibit 4, Forniss depo., 27:6-27:9).

11.      The assignment scheme favors females and disfavors males in the terms, conditions and privileges of employment.  (Plaintiffs' Exhibit 5, October-2006 Personnel Rotation Chart Staton Third Shift).  The Personnel Rotation Chart (Exhibit 5) is completed after the

month is over.  Even Warden Leon Forniss, after examining the October-2006 Personal

Rotation Chart stated that there was not an equitable distribution of assignments.

(Plaintiffs' Exhibit 4, Forniss depo., 11:8-11:14; 18:13-21:19).

12.     Working in the A, B, D, and G dormitories is extremely stressful, and Plaintiffs on each

shift have suffered from the stressful working conditions.  (Plaintiffs' Exhibit 1,

McClease depo., 38:16-39:7; Plaintiffs' Exhibit 2, Boddorf depo., 43:12-44:4; 68:6-

68:13; 85:14-85:19; Plaintiffs' Exhibit 3, Jacobs depo., 109:14-109:18; 111:19-112:17).

13.     McClease filed a formal grievance relating to this matter on or about October 17, 2005.

On or about February 16, 2006, the facts set forth above were found to be accurate and

the grievance was resolved in McClease's favor.  Despite that, nothing changed and the

disparate treatment continues.  (Plaintiffs' Exhibit 1, McClease depo., 61:3-62:5; 67:10-

67:13; 126:2-126:5; Plaintiffs' Exhibit 8, Alabama Dept of Corrections, Memo from

Hightower, dated 2/16/06; Plaintiffs' Exhibit 6, Employee Grievance, dated 10/17/05;

Plaintiffs' Exhibit 7, Harassment and Discrimination Complaint Form, dated 11/22/05).

14.     Sometime after October, 2005, Boddorf complained to his supervisor, Lieutenant

Copeland, that some employees worked certain dorms and others did not.  (Plaintiffs'

Exhibit 2, Boddorf depo., 44:22-46:5).

15.     Jacobs verbally complained to his direct supervisors, Eddie Browning and Richard

Golden, as well as Assistant Warden Thomas, that the posts need to be rotated because

the same individual work in the same hostile areas on a constant basis.  (Plaintiffs'

Exhibit 3, Jacobs depo., 49:3-49:15; 48:7-48:8; 50:14-50:18).

16.     Warden Forniss testified that the degree of ability to control the environment does not

control where Correctional Officers are posted. All Correctional Officers are able to work every post, unless they are on light duty. (Plaintiffs' Exhibit 4, Forniss depo., 25:5-25:23).

## III. LEGAL ARGUMENT

### A. SUMMARY JUDGMENT STANDARD

Under the provisions of Rule 56 ( c), F.R.C.P., summary judgment is appropriate if "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex v. Cattrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The movant "always bears the initial responsibility of informing the district court of the basis for its motion"... and ... must "demonstrate the absence of a genuine issue of material fact." *Id*.

After the movant has met its burden under Rule 56( c ), the non-movant must set forth "specific facts showing that there is a genuine issue for trial" *Id*. In ruling, the Court "must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513-14, 91 L.Ed.2d 202 (1986); cited in *Reeves v. Thigpen*, 879 F.Supp 1153, 1166 (M.D.Ala. 1995).

In entertaining a motion for summary judgment, the court should review all of the evidence in the record, drawing all reasonable inferences in favor of the nonmoving party, but the court may not make credibility judgments or weigh the evidence. *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990). Although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence supporting the nonmovant as well as that

evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses. 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529, pp. 299-300 (2d Ed. 1995); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000).

In an employment discrimination case, the court is required to consider the evidence supporting the plaintiff's prima facie case and any such evidence tending to undermine the defendant's nondiscriminatory explanation. The existence of a prima facie case combined with sufficient evidence for the trier of fact to disbelieve the defendant's proffered nondiscriminatory reason for the employment action it took is sufficient for the trier of fact to infer the ultimate fact of discrimination. *Reeves*, at 147.

## B.  ARGUMENT-PIGGYBACKING DOCTRINE

**Plaintiffs Boddorf and Jacobs properly joined this lawsuit under the piggybacking doctrine.**

Generally, an employee who wishes to sue his employer for non-race based discrimination must exhaust his administrative remedies by filing a charge of discrimination with the EEOC.  "Under the piggybacking rule, however, a putative plaintiff who has not filed his own EEOC charge may 'piggyback' his claim onto the claim of a plaintiff who has filed a timely charge." *Hipp v. Liberty Nat. Life Ins. Co.,* 252 F.3d 1208, 1217 (11th Cir.2001) (citations omitted).

The Eleventh Circuit has "adopted the two requirements used in Title VII piggybacking cases: A plaintiff may piggyback on another plaintiff's charge provided (1) the relied upon charge (to which he is piggybacking) is not invalid, and (2) the individual claims of the filing and non-

filing plaintiff (the named filing plaintiff and the piggybacking plaintiff) arise out of similar discriminatory treatment in the same time frame." *Id.* (citations and quotes omitted).

First, it is undisputed that the relied upon charge is valid. That only leaves whether the individual claims of the plaintiffs are similar in terms of discriminatory treatment and time frame. "[P]laintiffs need show only that their positions are similar, not identical, to the positions held by the putative class members." *Grayson v. K Mart Corp.,* 79 F.3d 1086, 1096 (11th Cir.1996) (quotes and citations omitted). The defendant agrees that McClease, Boddorf and Jacobs all hold the same position (Correctional Officer I), are assigned to the same facility (Staton) and are all males. Yet, the defendant claims since they worked different shifts, the plaintiffs are dissimilar. The piggybacking plaintiffs (Boddorf and Jacobs) have shown their positions are similar to McClease in all relevant respects. The positions comparison need not be identical.

## C.  ARGUMENT-SEX DISCRIMINATION

**1.  Plaintiff has established a *prima facie* case of sex discrimination**.

Plaintiffs contend that the defendant discriminated against them, male employees, with respect to their being assigned less favorable and more dangerous work than the female Correctional Officers.

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin..."  42 U.S.C. § 2000e-2(a).  *Maynard v. Board of Regents,* 342 F. 3d

1281, 1288 (11th Cir.2003).

Title VII does not require the plaintiff "to prove directly that race or gender was the reason for the employer's challenged decision. Rather, in showing that the employer discriminated against him, [Plaintiff] may rely on direct or circumstantial evidence of discrimination." *Maynard*, 342 F. 3d at 1288. See also, *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 526 (1993).

Since direct evidence of discriminatory conduct can be difficult to produce, it is appropriate to use the three-step burden shifting framework developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) to analyze circumstantial evidence of discrimination. First, "the plaintiff must create an inference of discrimination by establishing a *prima facie* case. If he does so, the defendant must 'articulate some legitimate, nondiscriminatory reason for the employee's rejection.'...The plaintiff may then attempt to show that these reasons are pretextual or may present other evidence to show that discriminatory intent was more likely the cause of the employer's actions." *Nix*, 738 F.2d at 1184. (quoting *McDonnell Douglas Corp.*, 411 U.S. 792 at 802); *see also Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

Plaintiffs must show: (1) that they belong to a protected group; (2) that they were subjected to an adverse employment action to which non-protected persons were not subjected; and (3) that the adverse action was based on their gender. *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973).

If plaintiffs choose to make use of the *McDonnell Douglas* presumption, they initially do not need to present evidence from which the trier of fact could conclude that the adverse employment action taken against them was caused by improper discrimination. Instead, they

9

need only establish that (1) an adverse employment action was taken against them, (2) they were qualified for the job position in question, and (3) different treatment was given to someone who differs with regard to the relevant personal characteristic. *Wright v. Southland Corp.*, 187 F.3d 1287 (11th Cir. 1999).

A plaintiff's *prima facie* case raises a presumption of illegal discrimination. *Burdine*, 450 U.S. at 254. *See also Hunter v. Citibank, N.A.*, 862 F.Supp. 902 (E.D.N.Y.1994), affirmed 60 F.3d 810, certiorari denied 116 S.Ct. 483, 516 U.S. 978, 133 L.Ed.2d 410. (Upon a showing by Plaintiff that she has met his *prima facie* burden, an inference of discriminatory intent is raised). As a general rule, "[d]emonstrating a *prima facie* case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir.1997).[2]

The defendant argues that Plaintiff has not established his *prima facie* case because (1) there is no evidence that Dorms A, B, D, and G are more dangerous than other duty post assignments; (2) there is no adverse employment action; and (3) Plaintiffs cannot show females were not assigned to the dangerous dorms. Plaintiffs respectfully disagree with the defendant's claim that Plaintiffs have not established a *prima facie* case.

First, McClease, Boddorf and Jacobs testified that A, B, D and G general population dormitories are more dangerous than any other duty post assignments.

Second, there is an adverse employment action in this case. Assignments to less favorable and more dangerous work surely constitutes an adverse employment action.

---

[2]  In the Eleventh Circuit, the satisfaction of the McDonnell Douglas test raises a "presumption," but not an "inference." *Walker v. Mortham*, 158 F.3d 1177, 1184, n. 10 (11th Cir. 1998).

Third, Plaintiffs have shown not that females were **never** assigned to the dangerous dorms, but that they were virtually never assigned to A, B, D, and G dormitories. McClease, Boddorf and Jacobs all testified that female Correctional Officers are assigned more favorable and less dangerous work than are the males. Boddorf and Jacobs also stated that while females may be assigned on paper to A, B, D, and G dormitories, in reality, they rarely worked those areas. In addition the assignments on paper (duty rosters) were not always accurate. Even Warden Forniss admitted that fact. Plaintiffs also have shown through Exhibit 5, the Personnel Rotation Chart, that the assignment scheme favors females and disfavors males in the distribution of posts. Warden Forniss testified that the Personnel Rotation Chart demonstrates an inequitable distribution of assignments. Unlike the duty rosters, the Personnel Rotation Charts are completed after the month is over.

Plaintiffs have established a *prima facie* case. Plaintiffs, all male and all in jobs they were qualified to do, were assigned (by the defendant) less favorable and more dangerous work than the female Correctional Officers.

**2. The Department of Correction's legitimate non-discriminatory reason is pretext**.

Plaintiff contends that the defendant's legitimate non-discriminatory reasons are pretext.

The defendant argues that its legitimate non-discriminatory reasons for Plaintiffs being assigned less favorable and more dangerous work than the female Correctional Officers are that the shift supervisors stated under oath that gender was not a consideration and the shift assignments are made by allegedly putting the best officer at a particular post who has the experience and ability to control that post.

The evidence sufficiently shows that the findings of the DOC regarding McClease's

11

grievance in October, 2005, of sex discrimination was in his favor. The memorandum states, "[t]he record shows a difference in the post assignments of female officers. [Male] officers were assigned certain posts considered undesirable."[3] The memorandum then goes on to state for its decision that, "[a]ll posts will be rotated, regardless of gender." (Plaintiffs' Exhibit 8, Alabama Dept of Corrections, Memo from Hightower, dated 2/16/06). The difference in post assignments between males and females was not explained away in the DOC's investigation memorandum as being due to "putting the best officer at a particular post who has the experience and ability to control that post."[4] (Def. brief, p.15). In light of the DOC's earlier findings that gender discrimination was present, a trier of fact reasonably could find that the DOC's current alleged legitimate, non-discriminatory reasons are pretext for discrimination. *See Mock v. Bell Helicopter Textron, Inc.,* 196 Fed. Appx. 773 (11th Cir. 2006) (In an age discrimination suit, the Eleventh Circuit has stated that it could be pretext if the employer does not provide the plaintiff with a reason for termination, but does so later).

This foregoing evidence combined with Plaintiff's *prima facie* case establish the defendant's legitimate non-discriminatory reason as pretext. The defendant's supposedly

---

[3] The exact quote is, "The record shows a difference in the post assignments of female officers. **Female** officers were assigned certain posts considered undesirable." Plaintiffs contend the word "female" was a typo and should have been "male." Otherwise, the memorandum makes no sense.

[4] Warden Forniss, during his deposition, first testified that the degree of ability to control the environment does not control where Correctional Officers are posted. All Correctional Officers are able to work every post, unless they are on light duty. (Plaintiffs' Exhibit 4, Forniss depo., 25:5-25:23). Later in his deposition, Forniss changed his story by stating that staffing decisions with regard to where to assign someone are based on differences in characteristics of the individual as well as their abilities. (Plaintiffs' Exhibit 4, Forniss depo., 35:10-35:14).

legitimate non-discriminatory reason for assigning and working Plaintiffs in the more dangerous

duty post assignments was not legitimate, nor was it reasonable and the defendants' "proffered

explanation is unworthy of credence." *Burdine,* 450 U.S. at 256 (1981) (citing *McDonnell*

*Douglas,* 411 U.S. at 804-805). In any event, there is a genuine issue of material fact as to that

point.

Plaintiff submits that there are genuine issues of material fact making this case

inappropriate for summary judgment. The Court is requested to deny the defendant's motion.

## CONCLUSION

The defendant's argument is rife with disputes as to material facts between the parties;

therefore, the defendant is not entitled to summary judgment.

RESPECTFULLY SUBMITTED on this the __22nd__ day of August, 2007.

/s/ JAY LEWIS
Jay Lewis
Law Offices of Jay Lewis, LLC
P.O. Box 5059
Montgomery, AL 36103
(334) 263-7733 (Voice)
(334) 832-4390 (Fax)
J-lewis@JayLewisLaw.com
ASB-2014-E66J

## CERTIFICATE OF SERVICE

This is to certify that I electronically filed the foregoing with the Clerk of the Court using
the CM/ECF system which will send notification of such filing to the following attorney(s) on
this 22nd day of August, 2007.

Albert S. Butler
Alabama Department of Corrections
P.O. Box 301501

Montgomery, AL 36130-1501

/s/ JAY LEWIS
Jay Lewis
Law Offices of Jay Lewis, LLC
P.O. Box 5059
Montgomery, AL 36103
(334) 263-7733 (Voice)
(334) 832-4390 (Fax)
J-lewis@JayLewisLaw.com
ASB-2014-E66J

14

Page 1

THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


JOEL McCLEASE, et al.,

        Plaintiff,

vs.                    CASE NO. 2:07-cv-019-MHT

ALABAMA DEPARTMENT
OF CORRECTIONS,

        Defendant.



* * * * * * * * * *

        DEPOSITION OF JOEL MCCLEASE, taken

pursuant to stipulation and agreement before

Wendy Lewis, Court Reporter and Commissioner for

the State of Alabama at Large, at the Alabama

Department of Corrections, 301 South Ripley

Street, Criminal Justice Building, Montgomery,

Alabama, on Wednesday, May 23, 2007, commencing

at 9:55 a.m.

        * * * * * * * * * *


PLAINTIFF'S
EXHIBIT
#1

DEPOSITION OF JOEL McCLEASE

6 (Pages 18 to 21)

| Page 18 | Page 20 |
|---|---|
| 1      Documents sent to the EEOC or<br>2      received from the EEOC have not<br>3      been supplied. And that's what<br>4      I'm asking about specifically.<br>5      MS. GERARD: That's fine. If and when<br>6      we get those documents, we will.<br>7      That's fine with us.<br>8 Q. Have you received what's known to be a right<br>9      to sue letter, Mr. McClease?<br>10 A. No, I haven't, unh-unh.<br>11 Q. Not from the EEOC?<br>12 A. Not from the EEOC.<br>13      MS. GERARD: Wait, wait, wait. Would<br>14      you copy those, if you don't mind?<br>15      MR. BUTLER: I'm going to mark these #1<br>16      and #2, please, ma'am.<br>17      MS. GERARD: Would you copy those and<br>18      give them back to me, please?<br>19      MR. BUTLER: Yeah.<br>20      MS. GERARD: Because I don't have a<br>21      copy.<br>22      MR. BUTLER: Yeah. I'll be happy to do<br>23      that, and I'll mark the copy. How | 1      MS. GERARD: At least you've got some<br>2      of them now.<br>3      MR. BUTLER: Yeah.<br>4 Q. Would you just briefly for us, please, sir,<br>5      explain your employment with the Department<br>6      of Corrections?<br>7 A. Are you talking about from the first time<br>8      I -- when I first start?<br>9 Q. Yes, sir.<br>10 A. I was employed by the Department of<br>11      Corrections in -- I went to school in August<br>12      of '89. I worked there -- I worked at Kilby<br>13      Correctional Facility.<br>14 Q. Can I interrupt? When you say you went to<br>15      school, are you talking about the academy?<br>16 A. The academy.<br>17 Q. Yes, sir. All right. Just wanted to make<br>18      sure I was clear on that. Go ahead. I'm<br>19      sorry.<br>20 A. Upon graduation from the academy, I went to<br>21      Kilby Correctional Center. I worked there<br>22      until '94. Then in '94 I left there. Then I<br>23      came back to the Department of Corrections |
| **Page 19** | **Page 21** |
| 1      about that? Anything else?<br>2      MS. GERARD: No. Those are the EEOC.<br>3      MR. BUTLER: Excuse me one second.<br>4      MS. GERARD: Sure. Go ahead.<br>5      (Brief interruption)<br>6      MS. GERARD: And can the record reflect<br>7      that we did give you now the EEOC<br>8      documents?<br>9      MR. BUTLER: If you're representing for<br>10      the record that those are the only<br>11      EEOC documents that Mr. McClease<br>12      has received.<br>13      MS. GERARD: I --<br>14      MR. BUTLER: If you're not representing<br>15      that, then I would insist upon<br>16      continuing -- the ability to<br>17      continue this deposition until I<br>18      receive all of the documents that<br>19      he has received from the EEOC or a<br>20      copy of any documents that he sent<br>21      to the EEOC.<br>22      MS. GERARD: That will be fine.<br>23      MR. BUTLER: All right. | 1      in -- let's see what year it was. If I'm not<br>2      mistaken it was '90 -- '90 -- '98, '99. And<br>3      I went back to Kilby. Then in 2000 I went to<br>4      Staton and have been there since.<br>5 Q. Okay. So you have worked with the Department<br>6      on how many occasions?<br>7 A. Two.<br>8 Q. Isn't it true that it's three?<br>9 A. Three?<br>10 Q. Haven't you resigned twice?<br>11 A. Let me see. Okay. Now, that's -- let me<br>12      see. Yeah. Because I had went -- I went<br>13      back in '98. Then I was -- then I was gone<br>14      again for six months. So it's been three.<br>15 Q. Did you resign on both occasions?<br>16 A. Yes, sir.<br>17 Q. You were working, I believe, at Kilby when<br>18      you resigned the first time?<br>19 A. Yes, sir.<br>20      MR. BUTLER: I have marked these two<br>21      documents that you have given me<br>22      which appear to be the same<br>23      documents. |

Joel McClease, et al. v. Alabama Department of Corrections                5/23/2007
DEPOSITION OF JOEL McCLEASE

9 (Pages 30 to 33)

---

**Page 30**

1  Q. Just a take second and read it, then, because
2     that's specifically what I'm going to be
3     asking questions on today.
4  A. Yes, I've seen this.
5  Q. Okay. Do you agree with what's claimed in
6     this complaint?
7  A. Yes.
8  Q. If we could -- and I only have one copy. I
9     can go make a copy. But in paragraph seven
10    under nature of proceedings, you appear to be
11    maintaining that the -- claiming that the
12    Department is maintaining a policy custom
13    usage of discrimination because of your
14    gender with respect to the terms, conditions,
15    and privileges of employment. Do you see
16    that under seven?
17       MS. GERARD: I'll let him use my copy.
18       MR. BUTLER: Thank you very much.
19       MS. GERARD: That's fine.
20  A. Yes.
21  Q. What do you mean by with respect to the
22    terms, conditions, and privileges of
23    employment?

---

**Page 31**

1       MS. GERARD: Objection. You can still
2          answer.
3  A. Oh, like women -- women have certain
4     privileges there that mens don't have.
5  Q. What privilege is that?
6  A. Not working in dorms that we -- that is
7     deemed there as bad dorms.
8  Q. Okay. Is that the only privilege or term or
9     condition that is different between you and
10    the women, males and the females?
11  A. They -- they get better evaluations than we
12    do.
13  Q. They get better evaluations?
14  A. Without, you know, working every post. The
15    guys work every post. Women just work
16    certain posts, but their evaluations is
17    higher.
18  Q. How many females do you have on your shift?
19    And from the period of October to present, I
20    know that number changes. But if you would,
21    just give me an average about how many there
22    are?
23  A. Five.

---

**Page 32**

1  Q. Five? Could you name them?
2  A. Ms. Johnson.
3  Q. And that would be Cathy Johnson or Casandra
4     Johnson?
5  A. Casandra Johnson. Okay. Ms. Lawrence.
6  Q. That would be Florence Lawrence?
7  A. Florence. Ms. Parker.
8  Q. Latina Parker?
9  A. Yeah. Ms. Parker. Ms. Richardson. And let
10    me see.
11  Q. How about Linda Tiller?
12  A. Yes, Ms. Tiller. And it's been a couple of
13    more that had left.
14  Q. Okay. I don't see any names in there that --
15    other than what you've named. Do you
16    remember any of them who left?
17  A. Let me see. I remember one, but I can't
18    think of her name right now. Oh,
19    Ms. Nobles. She was there. She left.
20  Q. What was her first name? Do you recall?
21  A. I don't recall her first name.
22  Q. When was this?
23  A. She left in like probably beginning of 2005

---

**Page 33**

1     or middle of 2005.
2  Q. Okay. If we could, let's go from October of
3     2005 --
4  A. Well, them five, them five.
5  Q. Has there ever been a time where there was a
6     total of five females working on your shift?
7  A. Yes.
8  Q. When was that?
9  A. Up until this January when they changed
10    shifts.
11  Q. Are you saying from October 2005 up until
12    January 2007 there were five females working
13    your shift?
14  A. There were five.
15  Q. Okay. And after January, how many females
16    were there?
17  A. The one that left now is Tiller, Ms.
18    Johnson, Ms. Richardson. It's -- it's three
19    now. Tiller, Ms. Johnson, Ms. Richardson.
20    That's the only three now.
21  Q. Okay.
22       MS. GERARD: Is it possible to get some
23    water in here?

Joel McClease, et al. v. Alabama Department of Corrections                    5/23/2007
DEPOSITION OF JOEL McCLEASE

11 (Pages 38 to 41)

Page 38

1   Q. And the privileges we're talking about is
2      that they were given easier shift assignments
3      in the easier dorms?
4   A. Yes.
5   Q. And evaluations. Any other benefits or
6      privileges that they got?
7   A. That's all I can think of right now.
8   Q. Okay. So the only thing that is unequal
9      between the males in you and the females at
10     that facility is their privileges that they
11     get; other words, the better evaluations
12     and the easier shift assignments?
13  A. To me?
14  Q. Yes, sir.
15  A. Yes.
16  Q. Okay. It claims that you suffered great
17     mental anguish. How did you suffer great
18     mental anguish?
19  A. Because I have to -- when I have to be down
20     there in, like I say, the so-called hard
21     dorms and I be down -- like a lot of times
22     I'm there, I'm scheduled to work there. I'm
23     there by myself. And it be two females in

Page 39

1      the easy dorm, and, you know, they could
2      send -- if it was a male -- if it was a male
3      in that easy dorm -- two males in that easy
4      dorm they would send one of the males to --
5      to a hard zone. But they're not going to
6      send a female from a easy dorm to a hard
7      dorm.
8   Q. You mean if trouble erupted?
9   A. No, not trouble.
10  Q. Or just assignment?
11  A. Just assignment.
12  Q. You would agree with me then if trouble
13     erupts everybody centers and goes to that
14     trouble; is that correct?
15  A. No , I can't agree with you on that.
16  Q. Okay. Who would go?
17  A. I agree with -- I agree with you on that if
18     trouble come -- if trouble do happen they
19     call the code and whoever respond to that
20     code come there.
21  Q. Have you ever had a code call?
22  A. Yes.
23  Q. Any females respond?

Page 40

1   A. Most of them be on the tower all the time. I
2      never -- I never had one where a female came
3      there.
4   Q. Okay. That was my question. How many codes
5      have you had called?
6   A. Maybe about --
7   Q. From October of 2005 to present?
8   A. Maybe about two or three.
9   Q. And you can't ever remember a female coming?
10  A. The only -- okay. Only female that might
11     have -- that came there was like the sergeant
12     which she wasn't a shift commander. That's
13     the only female. The other females, no.
14  Q. Okay. And that caused you great mental
15     anguish?
16  A. That particular -- at that particular time
17     that -- when you call a code, you -- you
18     worrying about, you know, how far this thing
19     going to escalate or you trying to get up out
20     of there. You know, you don't worry about --
21     you ain't worried about the mental anguish
22     until after you sit down and think about what
23     all done happened.

Page 41

1   Q. And I believe you would agree with me that as
2      soon as you walk in any gate that exposes you
3      to inmates in any of our facilities that
4      you've worked at, you're in a potential
5      dangerous zone, are you not?
6   A. From the time you get there, you are.
7   Q. And that's everywhere?
8   A. Every institution I ever been to.
9   Q. And everywhere inside that institution if
10     there are inmates around and you're exposed
11     to them?
12  A. Is it dangerous?
13  Q. Yes, sir?
14  A. Not -- not everywhere. Not -- not
15     everywhere.
16  Q. All right. Let's go specifically at Staton.
17     What is a -- an area that you would consider
18     not dangerous at all where you are exposed to
19     the inmates?
20  A. The shift office is one.
21  Q. And why was it not dangerous?
22  A. It's not dangerous because inmates don't hang
23     out there.

Page 42

1  Q.  Are inmates brought there for counseling and
2     investigations of wrongs that they are
3     accused of?
4  A.  Talking about such as disciplinary hearings?
5  Q.  Yes, sir.
6  A.  Yes.
7  Q.  And do they get agitated and mad on occasion
8     when they come to the shift office because of
9     what they've been accused of or get
10    disruptive and have to be restrained by force
11    in the shift office?
12 A.  I never -- I never seen them do that, but
13    it's possible that that could happen.
14 Q.  Any other place?  Let me -- before you
15    answer that, let me interrupt you.  And I
16    apologize.  Anytime you have to use force on
17    an inmate to control him, you are putting
18    yourself at risk, are you not?
19 A.  That's true.
20 Q.  Okay.  Go ahead.  I'm sorry.  Any other place
21    that you feel that is not dangerous where
22    inmates are present?
23 A.  Inside, not counting the towers.

Page 43

1  Q.  Inside, not counting the towers.  I will
2     agree with you the towers are not dangerous.
3  A.  In the hospital -- in the hospital -- over
4     there in the hospital.  That's another place.
5  Q.  Are inmates assigned to the hospital with
6     serious mental disorders at times?
7  A.  Serious mental disorders?
8  Q.  Disorders.
9  A.  The ones with serious mental disorders is
10    locked up in a separate cell.
11 Q.  Right.  But if they have an episode, a mental
12    episode, are they first brought to the HCU --
13    and you're saying the hospital; that's the
14    same thing I call the healthcare unit, is it
15    not?
16 A.  Healthcare unit.
17 Q.  Okay.  Are they brought to the healthcare
18    unit?
19 A.  Are they brought there?
20 Q.  Yes, sir.
21 A.  If -- what exactly are you talking about?
22 Q.  If they have a -- let's say they're SMI --
23    tell us what SMI is.

Page 44

1  A.  Seriously mental ill.
2  Q.  Yes.  If they have a --
3  A.  If they're seriously mental ill, they're not
4     going to be at Staton anyway.
5  Q.  Okay.  If they've got a mental defect or
6     mental disease, could they be at Staton?
7     Aren't they assigned to a specific dorm at
8     Staton?
9  A.  No.
10 Q.  Are you sure?
11 A.  It's supposed -- it's supposed to be like
12    that where they're assigned.  See, they
13    don't -- Staton don't know every inmate that
14    have a mental disorder.  Because like I -- I
15    have worked at Kilby in mental health.  And
16    I -- the mental health dorm for Staton
17    supposed to be D, D dorm, which is not F
18    dorm.  But them inmates -- it be inmates in
19    all the other dorms that I don't work
20    there -- I don't work with at Staton that
21    have mental problems.  So see, they don't all
22    really know who got the mental problems.
23 Q.  Okay.  But if an inmate has a serious

Page 45

1     episode, mental episode --
2  A.  Like he want to hang hisself or something?
3  Q.  Or just goes berserk, starts throwing his
4     fists and you've got to take him to the
5     health care unit?
6  A.  Uh-huh.
7  Q.  And he's in health care unit.  He poses a
8     significant danger while in that health care
9     unit, does he not?
10 A.  No, he don't.
11 Q.  Why?
12 A.  Because he is handcuffed, and there's two
13    officers with him and he is taken -- he is
14    taken from where he at directly to a cell.
15 Q.  Okay.  And does the nurse examine him when he
16    gets to the health care unit?
17 A.  She have to -- she have to give him a body
18    chart, yes.
19 Q.  Okay.  And does she remove -- does she have
20    those handcuffs removed when she does the
21    body chart?
22 A.  No, no, they're not removed.  She don't have
23    to remove them to do a body chart.

Page 50

```
 1      and relatives.  Now, do you have a direct
 2      contact with the inmate Family and relatives?
 3   A.  No, I don't.  No, I don't.
 4   Q.  Then tell me what public ridicule that you
 5      suffered.
 6   A.  Well, I know -- okay.  Like some of the
 7      inmates I know.  I'm talking about like off
 8      the street before they were locked up.
 9   Q.  Okay.
10   A.  You might see one of them at the store
11      somewhere or this or that, you know.  And,
12      you know, they might stop -- just stop to
13      have a conversation, stop talk to you.  Hey,
14      how are you doing, haven't seen you in a long
15      time.  So-and-so told me you work down there,
16      that you always work their dorm or this or
17      that.  That's about the only thing --
18   Q.  Has that ever happened to you?
19   A.  Oh, that happen to me a lot.
20   Q.  Tell me what inmate stopped you and told you
21      that?
22   A.  I didn't say an inmate.  I said their family.
23   Q.  Tell me what family member.
```

Page 51

```
 1   A.  I can't say because I, you know, I don't
 2      remember.  I don't remember.  But I'm saying
 3      I've been in stores -- I've been in stores
 4      where, you know, I seen an inmate -- an
 5      inmate's family that's shopping in the same
 6      store come up and say, Hey, how are you
 7      doing, Mr. McClease?  Okay.  You know, like
 8      that.
 9   Q.  You're claiming in this amended complaint
10      that the female correction officers are
11      assigned more favorable and less dangerous
12      work than males; is that correct?
13   A.  Yes.
14   Q.  How many posts on third shift must be manned
15      every night regardless?
16   A.  Let me see the schedule.
17   Q.  Absolutely.
18   A.  All of them that's posted --
19   Q.  I'll give you December's, December of 2005.
20      Has it changed?
21   A.  Since?
22   Q.  Since October of 2005.  I don't think so.
23   A.  Ain't nothing changed.
```

Page 52

```
 1   Q.  If you'll call them out, I'll mark them to
 2      the side.
 3   A.  It's 19 posts that must be manned.
 4   Q.  19?
 5   A.  19.
 6   Q.  Would you call them out to me?
 7   A.  A, B, C, D, E, F -- no, A, B, C, D, E, G, H.
 8      Tower 1, 2, 3, 4, 5.  Rover A, B, C, D and E.
 9   Q.  Thank you, sir.  And those are day in, day
10      out must be manned every --
11   A.  Day in, day out.
12   Q.  Now, out of those posts that have to be
13      manned day in, day out, which post do you
14      contend -- or first, we'll go with that you
15      contend are dangerous.
16   A.  That are dangerous?
17   Q.  Yes, sir.
18   A.  All of them are dangerous, but to a certain
19      extent.
20   Q.  I understand and I would agree with you that
21      all -- anywhere inside a facility -- inside
22      that gate --
23   A.  I didn't say anywhere inside that gate.
```

Page 53

```
 1   Q.  I did.  I'm not saying you did.
 2   A.  Oh, okay.
 3   Q.  But what I'm saying is we can both agree that
 4      they are dangerous but in different degrees.
 5      Is that right?
 6   A.  Yes.
 7   Q.  Tell me which of these posts that must be
 8      manned -- and I'll be happy to give this back
 9      to you so you can see it.  And this is the
10      duty post log for the month of December of
11      2005.  Which ones are the most dangerous?
12   A.  Are the most dangerous?
13   Q.  Yes, sir.
14   A.  A, B, D and G.
15   Q.  Would that include the -- the -- what I'm
16      saying is G dorm rover?
17   A.  A lot -- a lot of times -- yeah, G dorm
18      rover.  Because G dorm rover have a different
19      duty than the rovers on A, B, C and D and E.
20      They got different duties.
21   Q.  But you wouldn't consider a G dorm rover a
22      more dangerous assignment?
23   A.  A more?
```

DEPOSITION OF JOEL McCLEASE

Page 54

1    Q. More -- as you considered A, B, and D, and
2       G.
3    A. They're not -- they're not no -- they're not
4       any more because they got three people over
5       there.  So that's not -- they -- they're not
6       going to be -- it's dangerous.  It's about
7       the same as A and B.  It's about the same as
8       A, B, and D.
9    Q. All right.
10   A. Them three.
11   Q. G dorm rover is?  I just want to make sure
12      I'm straight.
13   A. Yeah.  See, G dorm rover is just like G dorm
14      officer; don't nobody go nowhere.  On A, B,
15      C, D, and E dorm rover, you might not have a
16      rover.  They might pull that rover.
17   Q. If somebody is assigned as a rover in A, is
18      that a more dangerous --
19   A. Yes, it is.  It's very dangerous.
20   Q. All right.  How about if somebody was
21      assigned the rover in B?
22   A. Very dangerous.
23   Q. Okay.  How about the rover in D?

Page 55

1    A. Dangerous.
2    Q. And I believe you've already said that C and
3       E are not particularly dangerous?
4    A. No.
5    Q. Okay.  So let's go to A dorm at the very top
6       of the list.  Is that a cubicle?
7    A. It's a cubicle.
8    Q. How about B dorm?
9    A. Cubicle.
10   Q. D dorm?
11   A. Cubicle.
12   Q. G dorm?
13   A. Cubicle.  All the posts are cubicle.  All the
14      top -- the top posts is cubicle.
15   Q. Okay.  And for the purposes of this
16      deposition, a cubicle is -- is what?  Explain
17      that.
18   A. It's a fixed setting, a building where --
19      where the -- whoever is the cubicle officer,
20      that's his post.  That's what it is.
21   Q. It's a room where you can observe the bays
22      where the inmates are in; is that correct?
23   A. Yes.

Page 56

1    Q. And does it -- are you separated from the
2       inmates by anything either glass or bars or
3       doors?
4    A. Glass.  Glass.
5    Q. Is the cubicle in A, B, D, and G, if you're
6       assigned to that cubicle, are you behind
7       locked doors except when you call and be
8       excused to go to the bathroom or whatever?
9    A. The part -- the -- you're supposed -- you're
10      supposed to keep the door locked.  Some
11      people do, some people don't.
12   Q. Okay.  Is it the standard operating --
13   A. Procedure to lock the door.
14   Q. -- procedure to lock the door?
15   A. Yes.
16   Q. So the inmates -- what I'm trying to say,
17      Mr. McClease, can the inmates get to you
18      inside the cubicle?
19   A. Yes, they can.
20   Q. How?
21   A. They can kick the glass in.
22   Q. What kind of glass is it?
23   A. It's like plexiglass.

Page 57

1    Q. Do you have a radio when you're assigned to
2       that cubicle to call a code?
3    A. Yes, you do.  Yes.
4    Q. Do you think you could get a response by
5       calling a code if the inmates attempted to
6       kick the glass in?
7    A. If the radio working.  The equipment that we
8       use is poor.
9    Q. I don't disagree with that.  But what I'm
10      asking is --
11   A. You can get a response.  If the radio is
12      working and you call a code, you'll get a
13      response.
14   Q. Before they could probably kick the window
15      in?  It's a pretty thick window; is it not?
16   A. It's pretty thick.
17   Q. Got metal inside of it?
18   A. Inside of what?
19   Q. Two pieces of glass with metal in between
20      them, correct?
21   A. No, ain't no metal in between them.
22   Q. How thick is the glass?
23   A. It -- it's thick enough that if you hit it

Page 58

1    like that it rumbles.
2    Q. Pretty thick. So would you agree with me
3       that assignment to those areas, those cubes,
4       don't expose you to as much danger as being
5       in a rover position?
6    A. It exposes you to just as much danger as
7       being in a rover position.
8    Q. How?
9    A. Regardless of that glass because it has been
10      kicked out before.
11   Q. Has it ever been kicked out on you?
12   A. It ain't ever been kicked out on me.
13   Q. Has it ever been kicked out between October
14      of 2005 to present anytime during your shift
15      on any of those dorms?
16   A. Not that I'm aware of.
17   Q. Tell me an occasion where you know that the
18      glass was kicked out.
19   A. In these -- in one of these dorms?
20   Q. Yes, sir.
21   A. The ones -- on the dorms that I named?
22   Q. Yes, sir.
23   A. On the dorms that I named, I don't -- I don't

Page 59

1    know. But on one of the dorms I know.
2    Q. Tell me one that you didn't name that you
3       know that the --
4    A. H dorm.
5    Q. H dorm got kicked out?
6    A. Yeah.
7    Q. By an inmate?
8    A. By an inmate.
9    Q. Were you in it?
10   A. No, I wasn't in it.
11   Q. Was it on your shift?
12   A. I believe it was on second. Was it on
13      second? I believe it was second shift.
14   Q. And was it sometime during the period we're
15      talking about of October of '05 and present?
16   A. This just happened maybe about like six or
17      seven months ago.
18   Q. Now, this is H dorm?
19   A. Yes.
20   Q. Is this the old H or the new H?
21   A. The old H, the old hospital.
22   Q. Okay. Good. Thank you. Now, that's the
23      hospital, right?

Page 60

1    A. Yeah.
2    Q. HCU?
3    A. Yeah.
4    Q. Weren't you just telling me that HCU was an
5       area that you considered a less dangerous
6       assignment?
7    A. Yeah.
8    Q. Even though --
9    A. He kicked -- he kicked his way out of lockup.
10   Q. In HCU?
11   A. In HCU. And it's three doors you had to go
12      through to get to lockup. He's all the way
13      in back. He kicked hisself out of that
14      window there.
15   Q. Wouldn't you agree with me that that shows
16      that H can be a dangerous position?
17   A. I have -- like I said, every post there can
18      be dangerous.
19   Q. All right. Now, I take it from what you told
20      me and don't let me put words in your mouth.
21      I'm not trying to do that. But you consider
22      even being behind a locked door in a cubicle
23      to be just as dangerous as out roving in

Page 61

1    these dorms?
2    A. Yes, it's just as dangerous.
3    Q. All right. Now, you filed a grievance,
4       correct?
5    A. Correct.
6    Q. Alleging that the females were not being
7       assigned. And that grievance went up through
8       the warden and all the way to the
9       administration, correct?
10   A. Wrong. It didn't go through the warden.
11   Q. Okay.
12   A. I filed a grievance. I gave it to my shift
13      commander. After he -- after he gave me --
14      after he wrote me back on the grievance --
15      after he wrote me back on the grievance, then
16      the next night when I got to work, I was
17      assigned -- I was assigned to shift clerk.
18      So I skipped -- that was that step one. So I
19      skipped step -- I skipped step two because of
20      what he did and I went to step three.
21   Q. So it went straight to the administration?
22   A. Came straight downtown.
23   Q. And in, I think, February the 16th, you got

Joel McClease, et al. v. Alabama Department of Corrections                    5/23/2007
DEPOSITION OF JOEL McCLEASE

17 (Pages 62 to 65)

Page 62

1    a -- of 2006 you got a response?
2  A. Yes, I did.
3  Q. And you were told that the shifts would be
4     rotated without regard to gender?
5  A. Right.
6  Q. Correct? Let's talk about -- and I'm going
7     to get back to that in just a second. But
8     let's talk about for one second what you just
9     mentioned about being assigned to the shift
10    clerk. Does third shift have a shift clerk?
11 A. You mean a ASA-I?
12 Q. Yes, sir.
13 A. Not that I'm aware of.
14 Q. What does the shift clerk do?
15 A. Type all the daily activities.
16 Q. Keeps up the log, keeps up everything that --
17    that -- just keeps up with the paperwork for
18    that shift?
19 A. Yes.
20 Q. Is that an important function?
21 A. It's an important function.
22 Q. Have you ever refused to work in that --
23 A. Yes, I have.

Page 63

1  Q. Why was that?
2  A. Why did I refuse?
3  Q. Yes, sir.
4  A. Because I wasn't hired by the State as a
5     shift clerk. That's a ASA-I position. And I
6     was hired as a security officer, correction
7     officer.
8  Q. Would you consider that a nondangerous
9     position?
10 A. Yes, it is.
11 Q. Okay. And are you saying that you would
12    rather work in a more dangerous position than
13    work as a shift clerk?
14 A. I'd rather work -- I'd rather work what I was
15    assigned to do. And plus, I read -- if you
16    read here at the bottom of here by your
17    signature, you accept all -- okay. They
18    had -- they changed this. This used to read
19    by your signature you accept responsibility
20    for that post. That's what they used to
21    read.
22 Q. Okay. Here's the one -- when did this -- it
23    happened in when, October, right?

Page 64

1  A. Yes.
2  Q. There's October 2005. That's when it
3     happened, correct?
4  A. Yeah, this is 2005.
5  Q. What does it say on the bottom?
6  A. It says by your signature, you accept all
7     post and assignment.
8  Q. Okay. It said that in October of 2005, did
9     it not?
10 A. Yeah, that's 2005.
11 Q. When you were assigned that shift clerk, did
12    you leave the institution, refuse to work?
13 A. I didn't refuse to work it.
14 Q. Did you leave the institution?
15 A. Yes. I was told to leave the institution.
16 Q. You were told to leave the institution?
17 A. I was told if I didn't -- if I didn't want to
18    work as -- excuse me. I was told if I didn't
19    want to work as a clerk, that was the only
20    place he was going to put me, I can go home.
21    I said, Well, I'm going home.
22 Q. Okay. And did you receive a reprimand for
23    that?

Page 65

1  A. I received a letter of reprimand and leave
2     without pay for that night.
3  Q. And was that done by a supervisor?
4  A. Lieutenant Billy Pittman.
5  Q. Is that Lieutenant Billy Pittman male or
6     female?
7  A. He a male.
8  Q. But you do acknowledge that you refused to
9     work as a shift clerk?
10 A. Yes. I refused to.
11 Q. Okay. Now, in October, November, and
12    December of 2005 -- all right. Well, let's
13    go with November. November is when you made
14    the -- filed the grievance with the
15    administration about the assignment of the
16    females, correct?
17 A. Correct.
18 Q. Do you know how many times in November that
19    you were assigned to what you consider a
20    dangerous post that's listed in your
21    complaint, that being A, B, D, or G?
22 A. Do I know?
23 Q. Yes, sir.

Joel McClease, et al. v. Alabama Department of Corrections                                    5/23/2007
DEPOSITION OF JOEL McCLEASE

18 (Pages 66 to 69)

---

Page 66

1    A. After -- after I signed -- after I did the
2       grieve -- after I signed the grievance and
3       stuff --
4    Q. Yes, sir.
5    A. They stopped working me down there so much.
6       But before then, I used to be down there five
7       nights out of a week by myself.
8    Q. When was this? Would it have been in October
9       prior to the grievance?
10   A. That was prior to the grievance.
11   Q. Would you have been working five nights a
12      week in those dorms in October?
13   A. Did I do what now?
14   Q. Would you have been working in those
15      dangerous dorms that you contend dangerous,
16      A, B, D, and G five days a week in October of
17      2005 which is the month prior to you filing
18      the grievance?
19   A. Did I work in them?
20   Q. Five nights a week.
21   A. I was working in them an average about three
22      nights a week before -- prior to filing a
23      grievance.

---

Page 67

1    Q. Is it three or is it five?
2    A. A average of three.
3    Q. Three nights a week?
4    A. Prior to filing a grievance.
5    Q. Prior to filing a grievance. And October
6       would have been prior to filing the
7       grievance?
8    A. That's after the grievance. October is after
9       the grievance.
10   Q. You filed the grievance in November.
11   A. I filed the grievance -- I filed the
12      grievance with the shift -- with Lieutenant
13      Pittman on October 17th, 2005.
14   Q. I apologize. I don't have the duty post logs
15      but I will get them prior to that. But if
16      you would, look up October 1 through October
17      the 17th -- I've got it, I'm fixing to give
18      it you to -- and tell me how many times you
19      were assigned to work in what you consider a
20      dangerous dorm or dangerous assignment.
21   A. Three.
22   Q. Three times. And that's a period of how many
23      days?

---

Page 68

1    A. 17.
2    Q. 17 days. That's not what --
3    A. But just because it's on the schedule like
4       that don't mean I worked there.
5    Q. What do you mean?
6    A. Once I make the schedule, they -- sometimes
7       they pull you. You might -- you might go to
8       another dorm to work. You might go to
9       another dorm to work. You always -- if they
10      pull you, you're going to go to another dorm
11      to work, and the schedule ain't going to
12      reflect that. That schedule reflect what he
13      wrote up two weeks prior -- two weeks prior.
14   Q. It's also when there is a change, there's a
15      change notated out here to the side, isn't
16      it?
17   A. No, it is not. Sometimes like if they --
18      like recently -- recently when they changed
19      the schedules, they'll go and make another
20      copy and have you re-sign. But just because
21      they're on the schedule to work that post
22      don't mean they work that post.
23   Q. Well, I'm looking at November now. Okay?

---

Page 69

1       And I'm looking at names typed in of somebody
2       working overtime.
3    A. Uh-huh.
4    Q. Okay? That's typed in to correct the
5       original change or the original setting of
6       the shift, right?
7    A. Like I said, just because your name is on
8       that schedule don't mean you worked there.
9       He can always get the schedule -- if -- if
10      that overtime -- that overtime person, they
11      already -- they pick their days on when they
12      want to work overtime. They tell them weeks
13      in advance on when they're going to work
14      overtime.
15   Q. How about somebody calling in for sick leave?
16   A. If they call -- if they call in for sick
17      leave, they're going -- he's going to remove
18      them from the schedule. He's going to remove
19      them -- when he get there, he's going to
20      remove them -- he's going to reprint the
21      schedule and remove them from the schedule
22      and put them down there on sick time.
23   Q. Correct. So if somebody is changed from a

Joel McClease, et al. v. Alabama Department of Corrections                5/23/2007

DEPOSITION OF JOEL McCLEASE

## Page 110

1   A. I'm basing it on the difference -- the
2      difference in the dorms. The other dorms is
3      like special dorms. These -- these people
4      that's in them -- the dorms that I
5      call so-called easy dorms, they have reasons
6      not to act up.
7   Q. Is it your experience that inmates need a
8      reason to act up?
9   A. A lot -- a lot -- it's my experience that --
10     that if -- if they have like special
11     privileges and stuff like that, they act
12     better.
13  Q. In general?
14  A. In general.
15  Q. Okay. So do you have anything to support
16     your contention that these dorms are more
17     dangerous than the other dorms?
18  A. Because the inmates that they have in them
19     dorms that are considered dangerous, they
20     don't really have anything to look forward
21     to.
22  Q. Do you have any evidence about there being
23     more instances of violence in these dorms?

## Page 111

1   A. It be -- I don't have any evidence, but it is
2      more trouble. There is more calls. They get
3      called to them dorms more than any of the
4      other dorms.
5   Q. And what I'm asking I guess is have you got
6      anything that you can show me that that's the
7      case and not just you saying it?
8   A. I don't have anything I can show you, but
9      they have incident reports on what happens
10     down there.
11  Q. Have you written incident reports?
12  A. On anything that happened down there?
13  Q. From October 2005 to the present date, have
14     you written incident reports out of those
15     dorms?
16  A. I don't -- I don't have any problems when I
17     work there.
18  Q. So the answer to that is no?
19  A. No.
20  Q. Not one single incident report have you
21     written either as a rover or a dorm officer?
22  A. I -- I might have had one where I was a rover
23     and I responded to a fight and probably --

## Page 112

1      and was one of the first ones there.
2   Q. Okay.
3   A. And that wasn't in the dorm, that was in the
4      kitchen.
5   Q. Kitchen is a dangerous place, isn't it?
6   A. Yes.
7   Q. Got a lot of weapons?
8   A. Yes.
9   Q. You also contend that -- or do you contend
10     that not only are these dorms more dangerous,
11     the other assignments such as the tower,
12     dorms C, E, and H are easier to work?
13  A. Yes.
14  Q. You do?
15  A. Yes.
16  Q. What could be easier than sitting in a
17     cubicle?
18  A. What are you talking about? Sitting in what
19     cubicle?
20  Q. Sitting in any cubicle be it A, B, D, or G?
21     You're locked in a cubicle. What could be
22     easier than that?
23  A. You have to come out of that cubicle.

## Page 113

1   Q. To do what?
2   A. Because when you're the only -- when you're
3      the only officer in that cubicle, you have to
4      make checks every -- every 30 minutes of the
5      dorm and the doors inside the dorm.
6   Q. So you have to come out every 30 minutes?
7   A. You have to come out.
8   Q. The rest of the time you're sitting in there
9      observing?
10  A. Every 30 minutes you come out of the cubicle
11     and make a security check.
12  Q. When a rover is roving a dorm, he is
13     continuously walking through there; is he
14     not?
15  A. He make his checks every 30 minutes if he's
16     in the dorm.
17  Q. What does he do the other time that he's not
18     doing a check?
19  A. He's on a special detail. He might be
20     showering people. He might be going to
21     another dorm to shake down people, you know,
22     or different stuff like that. Or he might
23     have to go in the kitchen to be the kitchen

Joel McClease, et al. v. Alabama Department of Corrections                                5/23/2007
DEPOSITION OF JOEL McCLEASE

33 (Pages 126 to 129)

| Page 126 | Page 128 |
|---|---|
| 1  A. Yes. | 1  like I just told you. I know she worked -- I |
| 2  Q. And you're saying that you filed a grievance, | 2  know she worked in G dorm. That's the only |
| 3     the finding was in your favor but there have | 3  female that I know where she worked at. |
| 4     been no substantive changes? | 4  Q. Did you work on -- ever work on second shift? |
| 5  A. Correct. | 5  A. Have I ever worked on second shift? |
| 6  Q. And this was 45 days after you received the | 6  Q. Yes, sir. |
| 7     ruling from the department, the finding? | 7  A. Yes, I have. |
| 8  A. Correct. | 8  Q. At Staton? |
| 9  Q. But you would -- and you have agreed with me | 9  A. At Staton. |
| 10    in this deposition that in March women were | 10  Q. When? |
| 11    assigned to those posts, have you not? | 11  A. When I first got there in 2000. |
| 12  A. Very few. I agree with you, but like I say, | 12  Q. How about 2001, were you on second shift? |
| 13     very few times that they was down there. | 13     When did you move to third? |
| 14  Q. But they were assigned? | 14  A. I don't really know when I moved to third. |
| 15  A. Oh, yeah, they was assigned. | 15  Q. Was it in 2005? |
| 16  Q. Isn't that in conflict with what you've made | 16  A. No, it wasn't in 2005. It was before 2005. |
| 17     your charge to the EEOC? | 17  Q. Okay. So way long time before you filed this |
| 18       MR. LEWIS: Object to the form. | 18     grievance that you filed, correct? |
| 19  Q. Is it different from the charge you made to | 19  A. Do what now? |
| 20     the EEOC? | 20  Q. Way long time before you ever filed this |
| 21  A. I don't see where it's different at. | 21     grievance that you filed in October, November |
| 22  Q. There has been only one instance in which a | 22     of 2005? |
| 23     female was assigned to work in one of those | 23  A. What are you saying? |

| Page 127 | Page 129 |
|---|---|
| 1     dorms. The sole instance came after I filed | 1  Q. I'm saying that you had been in third shift? |
| 2     a grievance. One instance? | 2  A. Yes, yes. Yes. |
| 3  A. You talking about before I filed a grievance | 3  Q. For a long time prior to you filing this |
| 4     or after I filed a grievance? | 4     grievance? |
| 5  Q. I'm asking you what you mean, Mr. McClease. | 5  A. I been on -- yes, I had. |
| 6     You filed the complaint. | 6  Q. How about first shift ever worked first |
| 7  A. That mean -- I was referring to before I | 7     shift? |
| 8     filed a grievance there was only one female | 8  A. Yes, I have. |
| 9     working in one of them dorms and that was | 9  Q. When did you work first shift? |
| 10     Ms. Ray in G dorm. Other than that there | 10  A. I worked first shift when I first got there |
| 11     haven't been a female -- there haven't been a | 11     and when I was in training I did. |
| 12     female in any of them dorms in about a year | 12  Q. How long -- was it prior to you working |
| 13     to two years. | 13     second shift? |
| 14  Q. Are you talking about not just your shift but | 14  A. Yes, it was. |
| 15     first and second shifts? | 15  Q. And after second shift did you ever work |
| 16  A. I don't know what's going on first and second | 16     first shift again? |
| 17     shift. I'm talking about the third shift. | 17  A. No. |
| 18  Q. Ms. Ray didn't work third shift, did she? | 18  Q. Then how do you know who and what and where |
| 19  A. Ms. Ray worked second shift. | 19     people are assigned in either first or second |
| 20  Q. You just told me you didn't know what went on | 20     shift in 2005, 2006? |
| 21     in second shift? | 21  A. Because people talk. |
| 22  A. I'm talking about as far as you asking me | 22  Q. So you're getting this from what somebody has |
| 23     about females, you know, assigned like that | 23     told you? |

3783 6-12-07 BORDOFF,JOHN.txt

1

```
 1          IN THE UNITED STATES DISTRICT COURT

 2         FOR THE MIDDLE DISTRICT OF ALABAMA

 3              NORTHERN DIVISION

 4

 5

 6   JOEL McCLEASE, et al.,

 7          Plaintiffs,

 8   vs.              CASE NO. 2:07-CV-019-MHT

 9   ALABAMA DEPARTMENT
     OF CORRECTIONS,
10
            Defendant.
11

12

13

14         * * * * * * * * * *

15         DEPOSITION OF JOHN EARL BODDORF, taken

16   pursuant to stipulation and agreement before

17   Heather Barnett, Court Reporter and Commissioner

18   for the State of Alabama at Large, at the Alabama

19   Department of Corrections, 301 South Ripley

20   Street, Montgomery, Alabama, on Tuesday, June 12,

21   2007, commencing at approximately 8:57 a.m.

22         * * * * * * * * * * *

23
```

2

```
 1              APPEARANCES

 2   FOR THE PLAINTIFFS:

 3   Mr. Jay Lewis
     LAW OFFICES OF JAY LEWIS
 4   Attorneys at Law
     847 South McDonough Street
 5   Montgomery, Alabama  36104

 6   FOR THE DEFENDANT:
```



PLAINTIFF'S
EXHIBIT

#2

Page 1

3783 6-12-07 BORDOFF,JOHN.txt

21    I'd ask you to answer with your voice.  In

22    other words, with you shaking your head yes

23    or no, she's not going to be able to write

                          5

1    that down.  So if you would, answer with your

2    voice.

3         The other thing is I'm going to ask you

4    a question, and I'm going to assume that you

5    understand my question if you answer it.  In

6    other words, if you don't understand it, tell

7    me you don't understand it; and I will try to

8    rephrase it so that you best -- so that you

9    can answer.  You see what I'm saying?

10  A.  Oh, yes, sir.

11  Q.  I don't want you to answer anything assuming

12    that I mean something.  Basically, the

13    questions I'm going to ask you about today

14    concerning the shift assignments are in a

15    period of time from October of '05 to the

16    present time.  And I understand that you are

17    now retired; is that correct?

18  A.  Right.  Yes, sir.

19  Q.  When did you officially retire?

20  A.  May the 1st.

21  Q.  May the 1st?

22  A.  Uh-huh.

23  Q.  Of this year?

                          6

1  A.  Right.

2  Q.  All right, sir.  But that's the period of the

3    shift assignments that we're looking at.  I'm

                      Page 4

3783 6-12-07 BORDOFF,JOHN.txt

```
 4      going to also ask you about if you have any
 5      relatives in this area.  And the reason that
 6      I'm asking that is we're going to pick a jury
 7      here in the Middle District that's going to
 8      be from all over the Middle District.  And,
 9      basically, it's Montgomery and the counties
10      surrounding it.  And I may leave out a
11      couple.  And if I do, that's my fault and not
12      yours.  But do you have relatives, let's say,
13      in Montgomery, Lowndes, Macon, Chilton,
14      Autauga?
15  A.  I can save you time if you'll --
16  Q.  Yes, sir.
17  A.  I have one relative that lives in Alabama,
18      and that's up around Scottsboro.
19  Q.  Yeah, that did save me quite a bit.  Are you
20      married?
21  A.  No, sir.
22  Q.  All right, sir.  And don't have any children?
23  A.  No.
```

7

```
 1  Q.  All right, sir.  This may not confuse you,
 2      but I promise you it confuses Jay and I.  I
 3      know it confuses me.  They renamed the dorms
 4      out there at Staton I think about the middle
 5      of January of this year.
 6  A.  Somewhere along in there.
 7  Q.  And so I'm going to talk about and call them,
 8      if you don't mind, by their old names.
 9      That's just easier for me.  Okay?
10  A.  Uh-huh.
```

                              Page 5

3783 6-12-07 BORDOFF,JOHN.txt

11  Q.  Let me show you this.

12          MR. BUTLER:  And for the record, what

13              I'm showing him is the notice of

14              this deposition.

15  Q.  Have you seen that before?

16  A.  No, sir, not that I recall.

17  Q.  Okay.  I asked for certain things to be

18      brought to this deposition, and I don't think

19      there -- there are only two things.  I asked

20      you to bring any documents, tapes, or

21      information that support your claim of gender

22      discrimination or disparate treatment.  Did

23      you bring anything to support that?

                            8

1   A.  No.

2   Q.  Do you have anything to support that?

3   A.  No.

4   Q.  Any documents received from EEOC -- three

5       things -- and a copy of any documents sent to

6       EEOC.  Have you received anything from the

7       Equal Employment Opportunity Commission?

8   A.  No.

9   Q.  Have you sent anything to the Equal

10      Employment Opportunity Commission?

11  A.  No.

12  Q.  All right.  Please -- oh, let me tell you one

13      other thing.  Anytime you need to take a

14      break, you just tell us and we'll take one.

15  A.  Okay.

16  Q.  Please, from the beginning, if you will, give

17      us a brief outline of your employment with

3783 6-12-07 BORDOFF,JOHN.txt

18      DOC.

19  A.  Okay.  I started to work with the DOC in

20      December of 1978 at Staton, and I worked

21      there until May the 1st of 2007.

22  Q.  Always at Staton?

23  A.  Right.

                            9

 1  Q.  A little unusual, isn't it?

 2  A.  Probably.

 3  Q.  You started off as -- I think that was even

 4      before -- '78 was before -- was there an

 5      academy?

 6  A.  No.

 7  Q.  And you started off and then you just -- I

 8      think they were called something else.  They

 9      were called --

10  A.  Correctional counselors back then.

11  Q.  Correct.  Thank you.  And then you just kind

12      of grandfathered into a Correctional

13      Officer I?

14  A.  Well, I had -- I worked for the State before

15      then.  I worked with the Department of Mental

16      Health for a couple of years.  I had already

17      been through an academy with them.  And I

18      came in as a, whatever, the CO-I or whatever

19      they called it.  I guess it wasn't CO-I then,

20      but --

21  Q.  Correctional counselor.  And then they

22      changed the name of it to CO-I.

23  A.  Right.

3783 6-12-07 BORDOFF,JOHN.txt

11      doesn't matter whether somebody is best
12      suited in here?
13  A.  I think that you should be able to work to do
14      the job or else not do it, one or the two.
15  Q.  Right.  Okay.  There are certain positions --
16      are there any positions that you didn't like
17      to work?
18  A.  Yes.
19  Q.  What was that?
20  A.  The dorms that are mentioned there, A, B, C
21      and D.  You know, as time goes by, you begin
22      to dislike some of them more.  So, yes, there
23      were some that I disliked more than others.

17

1       Yes, sir.
2   Q.  Okay.  And did y'all ever -- did y'all ever
3       have -- I know y'all were on first shift,
4       right?
5   A.  Uh-huh.
6   Q.  And during this whole period of time we're
7       talking about, you were on first shift?
8   A.  No, sir.
9   Q.  No?
10  A.  I was on second shift.  When I first started,
11      I was on second shift.
12  Q.  Right.  But I'm talking from October '05 to
13      the present until you retired, you were on
14      first shift.
15  A.  Yes, sir.
16  Q.  Okay.  And I understand, normally, that's
17      when most of the administration is there; is

Page 13

3783 6-12-07 BORDOFF,JOHN.txt

```
18              that correct?
19         A.   Yes.
20         Q.   At least part of it.
21         A.   Right.
22         Q.   So, did y'all have a shift clerk assigned to
23              y'all, first shift?

                                18

1          A.   Yes, sir.
2          Q.   An ASA-1?
3          A.   Uh-huh.
4          Q.   which is different from a correctional
5               officer, correct?
6          A.   Right.
7          Q.   was there occasions where an officer had to
8               serve as the clerk for the shift because that
9               ASA-1 was off or sick or --
10         A.   Yes, sir.
11         Q.   were you ever assigned to that --
12         A.   No.
13         Q.   -- position?  Did you request to be?
14         A.   No.
15         Q.   was that a position you would want to take?
16         A.   No.
17         Q.   Okay.  why wouldn't you want to take that
18              position?
19         A.   well, for one thing, I can't type.  I'm just
20              not -- couldn't really do it, basically, to
21              be honest about it.
22         Q.   That's a position where, in your opinion, you
23              have to have certain skills to be able to

                            Page 14
```

3783 6-12-07 BORDOFF,JOHN.txt

21  Q.  That contention that you were assigned to

22      those two dorms because you were a male --

23  A.  Uh-huh.


                        41

1   Q.  -- when there was not a female able to be

2       assigned, when they were off.

3   A.  No, sir.  I can't say why it happened.  I can

4       just say that it happened.

5   Q.  And who's responsible for the shift

6       assignments?

7   A.  The shift commander.

8   Q.  You worked, I believe you told us, and

9       occasionally females would be -- would work

10      overtime on that shift; is that correct?

11  A.  On first shift?  Uh-huh.

12  Q.  And would they be the ones who were working

13      on overtime?  Would they be assigned -- the

14      females working on overtime on first shift,

15      would they be assigned to one of the more

16      dangerous dorms that you can recall?

17  A.  Are we talking about A, B, D --

18  Q.  A, B, D or G.

19  A.  They may have been occasionally -- I think I

20      remember maybe on occasion in G.  I don't

21      remember -- I don't believe there were in the

22      others.

23  Q.  What is a shakedown officer?


                        42

1   A.  Concerning what exactly?

2   Q.  I'm just looking at this.  It says

3       shakedown --

                        Page 32

3783 6-12-07 BORDOFF,JOHN.txt

```
 4  A.  Is this on a weekend?

 5  Q.  Wouldn't make a difference, would it?

 6  A.  Well, it could.

 7  Q.  Would it make a --

 8  A.  It could.  Because you could be talking about

 9      shaking down the visitors, you know, coming

10      in to see the inmates on weekends.

11  Q.  Right.  And are visitors both males and

12      females?

13  A.  Yes.

14  Q.  Would you be required -- since visitors, they

15      have to be shaken down --

16  A.  Right.

17  Q.  -- for contraband?

18  A.  Uh-huh.

19  Q.  Would that require a female and a male to be

20      on that yard to shake down -- the males to

21      shake down the male officers -- I mean the

22      male visitors, the females to shake down a

23      female visitor?
```

                              43

```
 1  A.  Right.

 2  Q.  So that's a requirement?

 3  A.  Uh-huh.

 4  Q.  You normally do not have female officers

 5      shaking down male visitors --

 6  A.  Right.

 7  Q.  -- or male visitors shaking down females,

 8      correct?

 9  A.  I don't recall that ever happening.

10  Q.  Yes, sir.  I hope not.  You worked, I believe
```
                         Page 33

3783 6-12-07 BORDOFF,JOHN.txt

11      you told us -- well, let me strike that.

12          You've told us, I believe -- and let me

13      get this straight -- that working in these

14      dorms, A, B, D and G, caused you more stress

15      because you would have to be assigned there

16      more often because the females were not.

17  A.  Right.

18  Q.  Is that what you're saying?

19  A.  Yes, sir.

20  Q.  Would it cause you any more stress other than

21      that? Any other reason to cause that stress?

22  A.  I'm not getting what you're --

23  Q.  Okay. Are those dorms -- were those dorms --

                        44

1       assignment to those dorms more stressful to

2       you than assignment somewhere else, whether

3       or not females were assigned there or not?

4   A.  Yes.

5   Q.  Would that be the same or equal stress that

6       you've just talked about having to be

7       assigned there more often because females

8       were not?

9   A.  The fact that you're there, the more you're

10      there, the more -- the more stressful it is.

11  Q.  And that stress is what caused you -- that's

12      the same mental anguish that you're talking

13      about in the complaint?

14  A.  That's part of it.

15  Q.  Then -- part of it. Is there any more?

16  A.  No.

17  Q.  Okay. Did you seek any kind of medical

                        Page 34

3783 6-12-07 BORDOFF,JOHN.txt

18     treatment for that stress?

19  A.  No.

20  Q.  Did you miss any work due to that stress?

21  A.  No, not to my knowledge.  Not that I recall.

22  Q.  Okay.  Did you ever complain to anybody at

23       Staton that assignment to these dorms was

                               45

1     causing you more stress?

2   A.  I didn't word it just like that.

3   Q.  Okay.  Tell me how you worded it.

4   A.  I did on occasion.  I mentioned it.  And I

5        maybe have a weird way of going about doing

6        things sometimes.  I never actually stated

7        that I'm upset because females are not doing

8        this.  I was -- I simply pointed out there

9        was a situation that some people were not

10       working these.  And I said if you are

11       interested enough to check and see who they

12       are, it's right there on the roster for

13       anybody to see, which it was and still is;

14       but --

15  Q.  So if the --

16  A.  But I guess nobody was interested enough.

17  Q.  Well, when you say nobody -- who did you tell

18       that to?

19  A.  I spoke to -- I remember Lieutenant Copeland

20       a couple of times.  I talked to him about it.

21  Q.  And when was that?

22  A.  It's been -- it's been some time.  I don't

23       know the date.

                          Page 35

3783 6-12-07 BORDOFF,JOHN.txt
46

1  Q.  Was it before October of 2005?

2  A.  I'm pretty sure it was after.

3  Q.  And Lieutenant Copeland was the shift

4      commander?

5  A.  First shift commander, yes, sir.

6  Q.  And when did he leave?

7  A.  He's still there, unless he left since May

8      the 1st.

9  Q.  Okay.  He's still the shift commander in

10     first shift?

11 A.  Right.

12 Q.  And you told him that you thought some people

13     weren't being assigned to those dorms?

14 A.  And can I add something, too?

15 Q.  Absolutely.

16 A.  I never went and complained on my own.  There

17     were a few times I was -- because it was

18     stated that I wasn't doing certain things in

19     the dorm the proper way, and I pointed that

20     out at that time.  I never voluntarily went

21     and said, hey, the females are not having to

22     do this.  I didn't do that.  Should have

23     probably, but didn't.

47

1  Q.  You said you did this when somebody

2      complained about you not doing something in a

3      dorm correctly?

4  A.  Right.

5  Q.  And would that have been in either a

6      supervisor's instruction or a warning or some

Page 36

3783 6-12-07 BORDOFF,JOHN.txt
64

1  A.  To me, that's an injury.

2  Q.  Okay.  How does that -- what injury has that

3      caused you?

4          MR. LEWIS:  Object to the form.  Asked

5               and answered.

6  Q.  All right.  Has it caused you any physical

7      injury?

8  A.  Not at this time, that I know of.

9  Q.  Has it damaged you in any way?  Either by

10     money, by out-of-pocket expenses.

11 A.  Well, maybe you could say money by the

12     five-day suspension that I received when you

13     have some other folks who were never put in

14     the position that I was in.  So I would say

15     possibly money in that case, yes.

16 Q.  And that was a five-day suspension.  And you

17     signed a written statement saying you didn't

18     go in there and wake them up and make them

19     clean up, didn't you?

20 A.  I didn't deny doing it.  Yes, I did, uh-huh.

21 Q.  And you knew that was your responsibilities?

22 A.  Yes.  And it was also the responsibilities of

23     some people who weren't having to do it.

65

1  Q.  How could it be a responsibility of some

2      people who were not having to do it?  Are you

3      saying that the women weren't required to

4      wake them up, make them clean the dorms?

5  A.  Yes.

6  Q.  They were not?

Page 50

3783 6-12-07 BORDOFF,JOHN.txt

```
 7  A.  Right.
 8  Q.  When did that happen?
 9  A.  Every day.  Monday through Friday.
10  Q.  What dorm was this in, the suspension?
11  A.  I believe it was the B dorm, if I'm recalling
12      correctly.
13  Q.  One of the dorms that you're saying was one
14      of the more dangerous dorms?
15  A.  Uh-huh.
16  Q.  But you're also saying women weren't assigned
17      to work B dorm, aren't you?
18  A.  Yes.
19  Q.  So, how can you say now that the women
20      weren't required to do that in B dorm?
21  A.  Because they should have been assigned there
22      and they were not.
23  Q.  I understand that, but they were required --
```

                            66

```
 1      if they were assigned there, they were
 2      required to wake the inmates up, make them
 3      clean up the dorm, run them out of the dorm,
 4      and do what they were supposed to, some
 5      things that you admittedly did not do.
 6  A.  If they had been assigned there.
 7  Q.  Correct.  And the records indicate that they
 8      were on occasion assigned there on all three
 9      shifts.
10          MR. LEWIS:  Object to form if it's a
11                  question.
12  Q.  So they would have --
13  A.  I would kind --
```

                    Page 51

3783 6-12-07 BORDOFF,JOHN.txt

14  Q.  So is that --

15  A.  I would debate that, that they were assigned

16      there.

17  Q.  Okay.  Fair enough.

18  A.  I would pretty much have to see that.

19  Q.  Yes, sir.  I apologize.  I thought I had

20      them.  I thought I had these marked.  I do

21      not.

22          MR. BUTLER:  I know that just kills

23              you.

                        67

1           MR. LEWIS:  Tears me up.

2           MR. BUTLER:  I thought I had those

3               marked like the rest of them.

4               I've got a feeling we will, but

5               just not today.

6   Q.  All right.  Other than the suspension, did

7       you suffer any more -- any other damage that

8       you can tell me about?

9   A.  If we're saying monetary damage --

10  Q.  Or any damage you can tell me about.  Your

11      complaint doesn't say monetary damage.

12  A.  Uh-huh.

13  Q.  It just says that you were damaged.  And I'm

14      just trying find out what damages you are

15      claiming.

16  A.  Like I say, other than knowing that I'm being

17      treated unfairly and the undue stress, that

18      would pretty much be it.

19  Q.  Okay.  And it says that you have undergone

20      disproportionate stress.  That's what you've

                    Page 52

```
                         3783 6-12-07 BORDOFF,JOHN.txt
21      said, basically, undue stress.
22  A.  What?
23  Q.  Your complaint says you've undergone

                            68
 1      disproportionate stress.
 2  A.  Yes.
 3  Q.  Okay.  It also says you suffered anxiety.
 4      Did you suffer anxiety?
 5  A.  Yes.
 6  Q.  Can you tell me what anxiety you suffered?
 7  A.  Just the anxiety of being in that
 8      environment.  That environment will create
 9      some anxiety.
10  Q.  Just being in the environment of inside a
11      correction facility or just those dorms?
12  A.  The dorms considerably more than the other
13      locations.
14  Q.  Okay.  And how did you experience anxiety?
15  A.  Like I say, just being in that environment.
16  Q.  What --
17  A.  It's just a stressful environment.  It's
18      extremely loud.
19  Q.  Right.
20  A.  You've got people that don't want to do what
21      you're trying to get them to do.  And it's a
22      stressful --
23  Q.  What does anxiety mean to you?

                            69
 1  A.  Nervousness, maybe somewhat the same as
 2      stress.  Close.  Very close, I would say.
 3  Q.  Would anxiety include fear?
                            Page 53
```

3783 6-12-07 BORDOFF,JOHN.txt

18  Q.  And, I mean, would it be constantly thinking

19      about it or just every now and then?

20  A.  I wouldn't say constantly; but, I mean,

21      I think -- I thought about it some, yes.

22  Q.  And you're saying here today that it bothered

23      you and caused you stress?

72

1  A.  Yes.

2  Q.  Then, why didn't you file a grievance?

3  A.  I've never filed a grievance on anything.

4  Q.  I understand.  But you know that that's your

5      right, do you not?

6  A.  Yes, sir.

7  Q.  And then you know that somebody can take it

8      and address it; isn't that correct?

9  A.  Yes.

10  Q.  From this period of time, from October of

11      2005 until you retired, was there a change of

12      assignments of assigning these females to

13      work in some of these dangerous dorms that

14      you've mentioned?

15  A.  Not to my knowledge.

16  Q.  So, no period of that time in there were

17      females assigned or believed to be -- I

18      believe you told me that only on a rare

19      occasion were they assigned in there.

20  A.  Right.

21  Q.  Right?

22  A.  Yes, sir.

23  Q.  And for it to be equal -- and we're going

Page 56

3783 6-12-07 BORDOFF,JOHN.txt

4      your normal off days?

5   A.  The last several years, on Saturday and

6       Sunday.

7   Q.  Okay.  When are your visitation days?

8   A.  Saturday and Sunday.

9   Q.  So you never had to work shakedown out there

10      on the visiting yard unless you were working

11      on overtime?

12  A.  I never did on overtime, as I recall.  I

13      don't believe I did.  Again, in that -- the

14      time frame you're referring to, I don't

15      believe that I -- I don't believe I did.  I

16      did many years ago, but not in that time

17      frame.

18  Q.  Okay.  In 2006, do you recall, on an average,

19      how many female CO-I's were assigned to first

20      shift?

21  A.  In 2006?

22  Q.  Yeah.  We talked about 2005, the last three

23      months.  And there were two, Parker and

                          79

1       Jackson.

2   A.  Uh-huh.

3   Q.  Do you recall if there were any more or what

4       the average was?

5   A.  At some point in time -- it must have been in

6       the start of 2006 -- Ms. Gullatte came to

7       first shift, which I guess made three.  As

8       best I recall, that was -- that was it.

9   Q.  Okay.  On your working overtime, voluntary

10      overtime on second shift, was it your opinion
                          Page 61

3783 6-12-07 BORDOFF,JOHN.txt

11      or your observation that females were not

12      assigned to the dangerous dorms on second

13      shift?

14  A.  Yes, sir.

15  Q.  Would that be only rarely were they assigned

16      or that they were not?

17  A.  If they were, I never saw it.

18  Q.  Okay.  But you would have an opportunity to

19      see the duty post roster when you would sign

20      in, would you not?

21  A.  You would.  But, again, the chaotic situation

22      I told you about, a lot of times you would be

23      rushing to try to relieve the -- what I

                            80

1       always did, to be honest with you, I signed

2       my name and I left to go where I was supposed

3       to go.

4   Q.  I understand.  But if this was causing you

5       stress, wouldn't you have at least looked to

6       see who was working where?

7   A.  Well, you wouldn't necessarily need to look

8       because, I mean, as the day progresses, you

9       discover who's, you know, where.

10  Q.  Do you know an officer on second shift by the

11      name of Yvonne Ray?

12  A.  Yes.

13  Q.  And what was -- did you know her?

14  A.  I knew who she was.  I didn't really know her

15      well; but, yes, I know -- I know who she

16      was.  She has retired quite some time back.

17  Q.  Right.  And retired some time in the end of

3783 6-12-07 BORDOFF,JOHN.txt

18    2006, I think.

19  A.  That's probably about right, yes.

20  Q.  Do you recall, when you worked overtime, did

21      you ever work when she was working?

22  A.  I'm sure that I did, yes.

23  Q.  Do you remember where she was assigned?

                        81

 1  A.  She -- for probably the last several months,

 2      she was assigned to G dorm.

 3  Q.  And that would be one of the more dangerous

 4      dorms?

 5  A.  Yes, sir.

 6  Q.  So females --

 7  A.  I believe Ms. Ray -- I believe that was kind

 8      of an agreement with Ms. Ray.

 9  Q.  She liked the G dorm?

10  A.  I think so, yeah.

11  Q.  Do you know whether she requested to work

12      there?

13  A.  I believe that she did; but, now, no, I can't

14      swear to that.

15  Q.  But that's one of the more dangerous --

16  A.  That's my understanding, yes.

17  Q.  That's one of the more dangerous dorms,

18      according to you.

19  A.  Yes.  I would -- I would say A and B are the

20      worst, and then probably D and G are probably

21      equal after that.

22  Q.  How do D and G compare to H, E and C?

23  A.  How do D and G --

                    Page 63

3783 6-12-07 BORDOFF,JOHN.txt

 7  Q.  One thing that I started in on -- and I'm

 8      trying to find it right now.  And I didn't --

 9      I didn't complete it.

10          Your complaint -- and I'll find it --

11      talks about you being subject to public

12      ridicule.  Have you been subject to public

13      ridicule?

14  A.  No.

15  Q.  Okay.  Let me make sure that that's what it

16      says.  And I'm looking for it right now.  I

17      know it's in here.  I just can't find it.

18      And I may have been incorrect.  Your

19      complaint may not have said public ridicule.

20      It said you have been greatly humiliated.

21      Have you been humiliated?

22  A.  No.

23  Q.  Okay.  It does say public ridicule.  I'm

                           84

 1      sorry.  I missed it.

 2          MR. BUTLER:  That's all the questions

 3              that I have.

 4          MR. LEWIS:  Let me see.  I may have a

 5              follow-up.

 6                  EXAMINATION

 7  BY MR. LEWIS:

 8  Q.  Mr. Boddorf, do CO-I's always work where the

 9      duty roster that you've seen say they work?

10  A.  To the best of my knowledge, yes.

11  Q.  Well, you had indicated also that it was kind

12      of chaotic and that sometimes after you

13      signed in, you would get assigned to a

                      Page 65

3783 6-12-07 BORDOFF,JOHN.txt

14    different place.

15  A.  Yeah, that happens sometimes.

16  Q.  So I guess my question was if the duty

17      rosters that Mr. Butler was showing you show

18      that on a particular day, somebody worked a

19      particular job, would that necessarily be

20      reliable?

21  A.  It could -- that could, in that case, be

22      incorrect.  It would be possible.

23  Q.  Once you were asked to work overtime or

                          85

1       agreed to work overtime, did you have a

2       choice as to where you worked?

3   A.  Sometimes yes, sometimes no.

4   Q.  Generally, were you assigned to work where

5       there was a need?

6   A.  Pretty much.  I mean, there were -- I can

7       remember one or two occasions when somebody

8       actually -- one of the supervisors actually

9       asked me where do you want to work, but that

10      was rare.  It did happen a time or two.

11  Q.  When they asked you where you wanted to work,

12      did you ever say A, B, D or G dorm?

13  A.  No.

14  Q.  When you were working in one of the dorms

15      that you considered to be more dangerous, A,

16      B, D and G -- and I believe you said A and B

17      are the most dangerous, correct?

18  A.  They're the most dangerous and the most

19      stressful.

20  Q.  Okay.  When you were working in those dorms,

3783 6-12-07 BORDOFF,JOHN.txt

21    did you basically watch your back a little

22    more closely?

23  A.  Yes, sir.

                        86

 1  Q.  Were you a little more apprehensive in those

 2      dorms?

 3  A.  Yes, sir.

 4  Q.  And did you have any fear for your safety in

 5      those dorms more than any other place?

 6  A.  A little more.  Some, I would say.

 7          MR. LEWIS:  Okay.  That's it.

 8                    EXAMINATION

 9  BY MR. BUTLER:

10  Q.  You say that A and B are the most dangerous,

11      and then --

12  A.  And stressful, yes.

13  Q.  And then would come D and G and then the

14      other post assignments on down the line; is

15      that correct?

16  A.  Yes.

17  Q.  What makes you say that A and B are the most

18      dangerous?

19  A.  A and B, they're younger inmates in there.

20      They're just more rambunctious.  They're just

21      a little different inmates than -- than in

22      the others.

23  Q.  Okay.  Inmates -- all the inmates assigned to

                        87

 1      Staton are level four, correct?

 2  A.  Yes, sir.

 3  Q.  And that could include an inmate up to and

                    Page 67

3783 6-12-07 BORDOFF,JOHN.txt

21  Q.  The same shift log that you originally

22      signed?

23  A.  Yes.


                          95

1   Q.  That would be put in Communications --

2   A.  Yes.

3   Q.  -- for you to sign out?

4   A.  Yes.

5   Q.  Okay.  What about if -- let's say you were

6       assigned to H dorm and somebody was supposed

7       to be coming in to work overtime and that

8       overtime officer was going to work five

9       tower.  Okay?  And the shift commander said,

10      look, this person didn't come in for five

11      tower; I'm going to pull you off of H and put

12      you in five tower.  Would you have -- would

13      that have been notated on the sheet,

14      corrected on the sign-in sheet?

15  A.  It should have been, yes, sir.

16  Q.  Did you ever see where it was changed,

17      corrected?

18  A.  I believe I remember seeing it like whited

19      out.  I'm recalling that.

20  Q.  All right.

21  A.  Yes.

22          MR. BUTLER:  Okay.  That's all the

23              questions I have.


                          96

1               EXAMINATION

2   BY MR. LEWIS:

3   Q.  One more where you were talking about being
                     Page 74

3783 6-12-07 BORDOFF,JOHN.txt

```
 4      assigned to one position and ending up
 5      working another one.  Were rovers
 6      occasionally pulled off their assignment and
 7      told to go somewhere else?
 8  A.  Yes.
 9  Q.  Would they have been the ones who would be
10      most likely to be reassigned?
11          MR. BUTLER:  Objection, form of the
12              question.
13  Q.  In your experience.
14  A.  Yes.
15          MR. LEWIS:  That's all I have.
16              EXAMINATION
17  BY MR. BUTLER:
18  Q.  You say in your experience, rovers are the
19      ones to be, most likely, reassigned.  Is that
20      your answer?
21  A.  Yes, sir.
22  Q.  You got anything to support that?
23  A.  Just my experience seeing it.

                97

 1  Q.  Okay.  Can you tell me some instances that
 2      that happened?
 3  A.  It happened to me on rare occasion.  Now, if
 4      you're asking for a date and time again, no,
 5      sir, I can't.
 6  Q.  Yes, sir.  That's what I have to have, so I
 7      can go back in the records and look and see
 8      if that's what happened on that day.  So
 9      that's what I'm asking for.
10  A.  No.
```

Page 75

Joel McClease, et al. vs. Alabama Department of Corrections

5/24/2007

# DEPOSITION OF MALCOMB JACOBS

Page 1

THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

JOEL McCLEASE, et al.,

     Plaintiff,

vs.           CASE NO. 2:07-cv-019-MHT

ALABAMA DEPARTMENT
OF CORRECTIONS,

     Defendant.

\* \* \* \* \* \* \* \* \* \*

DEPOSITION OF MALCOLM JACOBS, taken
pursuant to stipulation and agreement before
Wendy Lewis and Mallory Johnson, Court Reporters
and Commissioners for the State of Alabama at
Large, at the Alabama Department of Corrections,
301 South Ripley Street, Criminal Justice
Building, Montgomery, Alabama, commencing at
2:40 p.m. on Wednesday, May 23, 2007, and
continuing on Thursday, May 24, 2007.

\* \* \* \* \* \* \* \* \* \*

PLAINTIFF'S
EXHIBIT

#3

Joel McClease, et al. vs. Alabama Department of Corrections   5/24/2007
DEPOSITION OF MALCOMB JACOBS

5 (Pages 14 to 17)

Page 14

1  Q. Okay. Would you just briefly explain your
2     employment with DOC?
3  A. I started with DOC approximately 1985.
4     Started at Limestone Correctional Facility.
5     From Limestone Correctional Facility, I
6     transferred to Bullock. And from Bullock --
7     well, let me back up. I transferred to
8     Bullock '88 and around '80 -- not in '80, but
9     2004 I transferred to Staton approximately
10    October, somewhere around that time frame.
11  Q. Of 2004?
12  A. That's correct.
13  Q. That was a requested transfer by you?
14  A. Yes, sir.
15  Q. Have you --
16     MR. BUTLER: For the purposes of
17      identification of this deposition,
18      I don't need to mark this, but
19      this is the plaintiff's amended
20      initial disclosures. This was
21      filed, I assume, prior to them
22      being added as plaintiffs in this
23      action. So really, he can't

Page 15

1     answer a whole lot about that.
2     MR. LEWIS: Okay.
3  Q. Do you know anybody or can you give me the
4    names of anybody that has -- that you think
5    might have discoverable information
6    concerning this case? And when I say
7    discoverable information, I know you don't
8    understand what that means, but who might
9    have some knowledge about what you have
10   alleged in the complaint? Does that make
11   sense to you?
12     MR. LEWIS: In other words, anybody who
13      knows something about the claims
14      that we're making.
15  A. Oh, know something about this specific claim
16    here?
17  Q. Yeah.
18  A. Not to my knowledge. I don't --
19     MR. LEWIS: Let me try this.
20     MR. BUTLER: Sure.
21     MR. LEWIS: In other words, he's got a
22      right to go out and interview
23      witnesses.

Page 16

1     THE WITNESS: Okay.
2     MR. LEWIS: And he's got a right to
3      know who all might have some
4      knowledge of gender
5      discrimination, of the fact that
6      males are treated differently from
7      females, that sort of thing.
8      That's what he's looking for in
9      this case.
10  A. Outside of the -- the persons involved, I
11   can't answer that outside the persons that
12   involved, you know, as far as the people
13   that's documented, you know, we have
14   documented in the case here, I can't answer
15   that question.
16  Q. Okay. Just for my purposes, who are you
17   talking -- who are the people that are
18   involved? Are you talking about the three
19   plaintiffs?
20  A. Well, that -- that could include the three
21   plaintiffs and -- and/or the persons that are
22   involved; for example, on those schedules
23   that you was looking at earlier, on the

Page 17

1   schedules.
2  Q. Are you saying everybody on those shift
3   schedules? I'm just trying to find out what
4   you're saying.
5  A. On my -- well, I just put it -- on the ones
6   on my specific shift schedule, you know, as
7   far as what we did, you know, this -- this --
8   the schedule what we are dealing with now,
9   the second shift, I'm quite sure they don't
10   know about this case -- I don't know if they
11   know about this case here, how far in the
12   stages this -- this particular suit is
13   going. I don't know if that's the question
14   you're asking. But as far as what's going
15   on, you know, within the facility, I'm quite
16   sure they know what's going on there.
17   Right.
18  Q. What I'm asking is, there have been -- and
19   we're going to get into it in depth in a
20   minute. But there have been allegations made
21   in this amended complaint. And what I'm
22   asking for are any names of people that you
23   know of that would have any knowledge about

Joel McClease, et al. vs. Alabama Department of Corrections                    5/24/2007
DEPOSITION OF MALCOMB JACOBS

7 (Pages 22 to 25)

---

Page 22

1  Q. Yes, sir. I'm going to go through terms,
2     conditions, and privileges of your
3     employment.
4  A. The terms --
5  Q. The first one is the terms of your
6     employment.
7  A. I can't -- I can't respond because I don't
8     see any -- I don't see any terms being, you
9     know, as far as my terms of my employment, I
10    don't see any terms --
11 Q. How about changes in the terms of your
12    employment? Has there been any change in the
13    terms of your employment?
14 A. Not to my -- not to my -- not to my knowledge
15    of the terms.
16 Q. Has there been any change in the conditions
17    of your employment?
18 A. In the conditions. Can you elaborate a
19    little bit on the condition when you say
20    condition?
21 Q. This is your complaint, Mr. Jacobs.
22    MR. LEWIS: He's asking you about what
23    I wrote in the complaint. If you

---

Page 23

1     know, tell him. If you don't
2     know, if you don't understand,
3     tell him you don't understand.
4  Q. What's your answer?
5  A. I don't believe that anything has changed
6     any --
7  Q. Conditions?
8  A. Right.
9  Q. Okay. There's also privileges of
10    employment. Now, you've heard Mr. McClease
11    say that in his opinion, that was the only
12    thing that really made any changes in his
13    employment because the female officers on his
14    shift got better evaluations and were
15    assigned easier posts.
16 A. Okay. I have to agree with that part because
17    when you say certain posts -- when you work
18    overtime, for example. If I go down there
19    and look at that schedule, I know I'm going
20    to be working in the less desirable post to
21    earn that overtime. That same amount of
22    money paid overtime will be paid to a female
23    that can work maybe in a tower and get time

---

Page 24

1     and a half, which I have to go down and work
2     with -- sometime by myself in a hostile area,
3     for example, the old A and B. There's been
4     time I been down to A and B. And the odds of
5     me going down there to A and B would be
6     greater than that female.
7  Q. I'm going to get into that in just a minute.
8     But is that the only thing that you're saying
9     is those privileges about when you work
10    overtime, that they're assigned an easier
11    post when they work overtime than you are?
12 A. I mean, it's daily -- from day -- on a
13    day-to-day -- on a day-to-day basis, I could
14    be down there in an area and I need
15    assistance on certain things, and it's just
16    me in the most hostile area in the camp, you
17    know. I mean, but if -- they'll make sure --
18    on our shift, they'll make sure that they're
19    going to be -- I mean, first of all, they
20    won't be in that -- in that situation.
21 Q. Okay. Your complaint alleges that there are
22    four dorms --
23 A. Right.

---

Page 25

1  Q. -- that are more dangerous than the others;
2     A, B, D, and G. Do you agree with that or
3     disagree?
4  A. A, B, D, and G?
5  Q. Yes.
6  A. I agree.
7  Q. Are the more dangerous dorms?
8  A. That's correct.
9  Q. What is your basis of calling them more
10    dangerous dorms than any of the other dorms?
11 A. On my shift, the camp is open. A, B, D, and
12    G. You may be assigned to A or B. At any
13    given time, there's three -- two or 300 folks
14    in that dormitory in and out. We have to
15    make security checks in that dorm. We don't
16    have nobody but -- you don't have nobody but
17    yourself in that area. You open that cube,
18    and you go out and check your area and go
19    back in that cube. But who is to say the
20    time you go out of the cube, you got three,
21    400 people, you know, in your dormitory. I
22    mean, you're by yourself. That's what I mean
23    by it's a more dangerous situation.

Joel McClease, et al. vs. Alabama Department of Corrections    5/24/2007
DEPOSITION OF MALCOMB JACOBS

8 (Pages 26 to 29)

Page 26

1   Q.  Okay.  And --
2   A.  We're in a more concentrated area with
3       inmates.  It -- you -- nothing but white.
4       You don't see nothing but white.  It's just
5       that you're one blue uniform among all that
6       white in that dorm; and plus, it's a
7       closed-in area.  You got more guys can close
8       you in the dorm, lock the door, block the
9       door, you know.  It's just you, the dorm
10      officer.
11  Q.  Would you agree with me that as soon as you
12      step inside the gate or inside the gate with
13      inmates that you are at risk or at danger?
14  A.  Yeah, that's -- yes, sir.  You would be, yes,
15      sir.
16  Q.  What you're saying is that -- are you saying
17      that all the areas that have inmates are
18      dangerous, but there are some that are more
19      dangerous than others?
20  A.  Yes, sir.
21  Q.  Okay.  When you're in A dorm and B dorm and
22      you say on second shift they're out on the
23      yard, it's open --

Page 27

1   A.  Okay.
2   Q.  When there's an officer roving, and they're
3       out on the yard, they're roving in the yard
4       and in the dorm, correct?
5   A.  Not necessarily the case on our shift.
6       Rovers have secondary duties, second duties.
7       They may sign in as rovers, but the other
8       duty that they have, they have to go take
9       care of that.  Most of the time, those duties
10      won't be over until the yard is closed.  For
11      example, this rover may be assigned to the
12      pill call or something to that effect.
13  Q.  I understand that.
14  A.  But --
15  Q.  Let me ask you this question, then, just so
16      I'm clear in my mind.  Are you saying that
17      dorms A, B, D, and G are the more dangerous
18      dorms and that the roving positions in A, B,
19      D, and G are also included in those more
20      dangerous assignments?  Is that what you're
21      saying?
22  A.  What I'm saying is you can be assigned as a
23      rover in those dorms, but you don't be in

Page 28

1       that dormitory.  On paper, you're assigned to
2       that dormitory, but you're not in the
3       dormitory.  The person that's in that
4       dormitory is the cubicle officer.
5   Q.  Okay.  Let me -- because I don't think you're
6       answering my question.  I'm trying -- you
7       have alleged that there are certain
8       assignments that are more dangerous than
9       others, that females are in fact not assigned
10      to.  Okay?  That's what you've alleged in
11      your complaint.  What I'm trying to find is
12      specifically what areas you are talking about
13      that are more dangerous that females are not
14      assigned to?
15  A.  A -- okay.
16  Q.  A dorm, B dorm, D dorm, and G dorm, correct?
17      Are those --
18  A.  Yes, sir.
19  Q.  A rover, B rover, D rover, and G rover; is
20      that correct?
21  A.  Now, when you go to the rovers, I don't quite
22      understand the question.  You said A dorm, B
23      dorm, and the --

Page 29

1   Q.  A --
2           MR. LEWIS:  What he's asking is you've
3           already said that A -- the cubicle
4           officer in A, B, D, and G dorms
5           are the most dangerous.  He is now
6           asking you isn't it true or is it
7           true that also dangerous positions
8           are A rover, B rover, D rover, and
9           G rover.
10  A.  They're dangerous, but I will clarify it
11      saying it's not quite as dangerous because
12      they got opportunity to rove around and not
13      be in a concentrated area.
14  Q.  Are you alleging that A rover, B rover, D
15      rover, and G rover are not in your complaint
16      about females not being assigned there?
17  A.  No, I'm not saying that.  I'm not saying
18      that.
19  Q.  Are you saying that females are not assigned
20      to those positions and males are?
21  A.  Let me explain what I am saying.  What I am
22      saying is ever since I've been at that
23      institution, I haven't -- maybe -- well,

Joel McClease, et al. vs. Alabama Department of Corrections                    5/24/2007
DEPOSITION OF MALCOMB JACOBS

9 (Pages 30 to 33)

Page 30

1    maybe one female has been assigned in one of
2    those dormitories that was permanently
3    assigned there, was Ms. Ray.  The other
4    females either was on the towers or in the
5    health care unit.  And -- and that was it.
6    Maybe one incident they had one female down
7    there.  I can't recall.  I know one incident
8    they had one down there, but she didn't stay
9    down there a whole four hours, I don't think,
10    and they pulled her from out of there because
11    of an incident.
12  Q.  I'm just trying to find out, Mr. Jacobs, what
13    your contentions are.  Are you contending in
14    your complaint that we're here taking your
15    deposition on today that the rover in A, B,
16    D, and G are positions where -- are more
17    dangerous where men are assigned and females
18    are not?
19  A.  They're in just as much danger as far as a
20    rover.  Like you just said, once you're in
21    the institution, they -- in -- in the -- in
22    those areas -- when they're in those
23    dormitories.  When they are in those

Page 31

1    dormitories, I would say yes, they would be
2    in just as much danger when they are
3    stationed there in those dormitories.
4  Q.  And you're contending that females are not
5    assigned to A rover, B rover, D rover, and G
6    rover; is that correct?
7  A.  They are not assigned -- they may be
8    assigned, but I'm -- I -- I tell you -- what
9    I'm saying is they may be on paper, but in
10    reality they don't work the dorms.  They may
11    be on paper, but they don't work the
12    dormitories.
13  Q.  Well, you --
14  A.  The schedule might reflect it, but actually
15    being in the dormitory, no.
16  Q.  Do you have anything to support your
17    contention that even though they're assigned
18    an A rover, that a female never goes into A
19    dorm?
20  A.  I didn't say never go in the A dorm.
21  Q.  All right.  Well, then what are you saying?
22    You said they are assigned there on paper,
23    but they don't go into A rover position?

Page 32

1  A.  As I explained earlier, we had one individual
2    that was there that was on paper -- went in
3    the dorm, an incident happened, and was
4    pulled out of the dorm.  That's the only time
5    I can recall a female actually working in A.
6    I think that incident happened in B dorm.
7    That's the only time I can recall actually --
8  Q.  I thought we were talking about rovers.  Are
9    you talking about cubicles or rovers?
10  A.  Okay.  I was talking about the cubicles.
11    Now, the rovers, the rovers have other
12    duties.  The other duties will occupy most of
13    their time most of that afternoon.  So they
14    are basically going to be preoccupied with
15    other tasks.
16  Q.  So you're saying that the rovers don't really
17    rove any of those dorms?
18  A.  In the afternoons there are so many other
19    different tasks to be done, the only people
20    that are down in those areas are the cube
21    officers in those dorms.
22  Q.  In the afternoons?
23  A.  In the afternoons when we get on shift.

Page 33

1  Q.  At two o'clock?
2  A.  When we get on --
3  Q.  You get off at 10?
4  A.  Everything -- the rovers do not be in those
5    dormitories.
6  Q.  You're saying that the rover in A doesn't
7    rove A; the rover in B doesn't rove B; the
8    rover in D doesn't rove D; and the rover in G
9    doesn't rove G?  Is that what you're saying?
10  A.  On my shift, they will be -- when the yard
11    lock down, they will be maybe out -- whatever
12    detail the shift commander got for them,
13    they'll call them to the office or whatever.
14    On occasion, you may or may not see the rover
15    in those dormitories.  You may or may not see
16    a rover.
17  Q.  Well, which is it?  On occasion you may or
18    may not see it or they never rove it?
19  A.  They're roving, but they're not roving in the
20    area I'm -- if I'm in B dorm as a cube
21    officer, I never see my B dorm rover.  They
22    can have a female rover, but I never see her.
23  Q.  What you're saying is that they could have a

Joel McClease, et al. vs. Alabama Department of Corrections                    5/24/2007
DEPOSITION OF MALCOMB JACOBS

13 (Pages 46 to 49)

| Page 46 |
| --- |

1    you're thinking about right now that you've
2    told me about, you don't think it occurred in
3    dorms A, B, D, or G; is that correct?
4    A. That's involving the 601, you're saying?
5    Q. Yes. That's what you just said.
6    A. The ones that -- the one that I'm thinking of
7       right now may -- it's a possibility that it
8       doesn't involve one of those four dorms you
9       just named. However, I have written more
10      than just that one 60 -- I mean
11      disciplinary. That's what I'm saying. What
12      I can think of, I can't -- I just can't
13      recall.
14   Q. I understand. You've told me you've written
15      three or four, more or less, right?
16   A. Right.
17   Q. In the complaint, it says that you have
18      suffered great mental anguish. Can you
19      explain what mental anguish you've suffered?
20   A. Well, I'll put it like this, sir. I have a
21      real weak stomach. I can't -- sometime I go
22      home, don't sleep at night, you know. I get
23      antsy when I come to work because the first

| Page 47 |
| --- |

1    thing, I look at the schedule. I know
2    exactly where I'm going. And I have to, you
3    know, psych myself out for it. It makes me
4    anxious.
5    Q. It makes you anxious?
6    A. Well, actually, at work I can't -- when I go
7       home, I don't go to bed. I be up all night.
8    Q. It says that you've been greatly humiliated.
9       Who has humiliated you and how?
10   A. Well, I mean your peers. I mean if you
11      complain about a post, your peers are going
12      to humiliate you for one. Your supervisor.
13      I have had --
14   Q. Has your supervisor on second shift
15      humiliated you about post assignments?
16   A. In my opinion.
17   Q. In your opinion. Give me an example how.
18   A. Just in my opinion. I'm just saying.
19   Q. Give me an example.
20   A. Not taking me serious when I submit
21      paperwork, I guess. For example, you said
22      writing up inmates, not following up, you
23      know. I feel like if you don't get backing

| Page 48 |
| --- |

1    from your supervisor, you know, he's trying
2    to mess with your effectiveness at your
3    job -- at your work.
4    Q. Okay. And have you complained to your
5       supervisor about these post assignments?
6    A. Yes.
7    Q. Who is your supervisor?
8    A. Eddie Browning and Richard Golden.
9    Q. Have you ever made any complaints to him in
10      writing about these assignments?
11   A. In writing?
12   Q. Yes, sir.
13   A. Not that I can recall.
14   Q. Have you filed any grievances about these
15      post assignments?
16   A. At this camp here? At this particular camp
17      here at Staton?
18   Q. Any camp.
19   A. Or at any camp?
20   Q. But I'm talking about this because -- I'm
21      talking about this camp because I'm talking
22      about October 2005 to present?
23   A. I had filed some complaints regarding post

| Page 49 |
| --- |

1    assignments, but I can't recall one at this
2    particular camp here.
3    Q. Are you saying -- are you telling me that you
4       have complained about post assignments, but
5       you don't recall filing one about your post
6       assignments --
7    A. In writing.
8    Q. -- at Staton?
9    A. I've verbally complained to my superiors at
10      Staton. Verbally.
11   Q. Okay. So when you complained to -- who did
12      you complain to, Browning or Golden or both?
13   A. I complained to both. In addition, I also
14      brought it to the attention of Assistant
15      Warden Thomas.
16   Q. Okay. Let's start with Warden Thomas. When
17      did you bring it to his attention?
18   A. I can't give you the -- I can't give you the
19      exact date, time. But I -- I remember
20      mentioning it to him.
21   Q. How about the year and month?
22   A. Let's try -- I guess --
23      MR. LEWIS: He didn't ask you to

DEPOSITION OF MALCOMB JACOBS

14 (Pages 50 to 53)

Page 50

```
 1          guess.  If you don't know, tell
 2      him you don't know.
 3   A. I just can't give you --
 4   Q. Give me your best estimate.
 5          MR. LEWIS:  That's good.
 6   A. I estimate it happened in 2006.
 7   Q. Month?  Can you give me your best estimate on
 8      month?
 9   A. Mid 2006.  I can't give you an exact month.
10      Or the latter --
11   Q. That would be June, July?
12   A. The latter part, maybe.  The latter part of
13      2006.
14   Q. What did you -- what was your complaint to
15      Warden Thomas?
16   A. Basically, they need to rotate the post.  The
17      same individuals work down in the same area,
18      the same hostile area on a constant basis.
19   Q. And were you one of those individuals that
20      was constantly working down in the hostile
21      areas?
22   A. At that time, yes, sir.
23   Q. And how many times would you working in those
```

Page 51

```
 1      hostile areas, let's say, a week?
 2   A. I would get that area maybe twice a week.
 3   Q. Twice a week?  You work five days, don't you?
 4   A. Once or twice.  Once or twice.  I work down
 5      there one side one day and the next side the
 6      next day.
 7   Q. Well, anywhere on those four posts, how many
 8      times a week, any of those four posts either
 9      rover or cube.
10   A. On those -- on those I can speak for A and B.
11   Q. A, B, D, and G.  That's what your complaint
12      says, Mr. Jacobs.
13   A. A and B --
14   Q. D and G.
15   A. I would say either A or B, it would be once
16      or twice a week.
17   Q. Just A or B once or twice a week?
18   A. Right.  Because they had -- on our shift,
19      they got officers that were assigned
20      permanently to some of the other posts.  So
21      those two headaches was left to the certain
22      officers, male officers.
23   Q. Male officers?  Did they request to work
```

Page 52

```
 1      those posts, D and G?
 2   A. I don't know if they requested it or not.
 3   Q. If they had requested to work those posts,
 4      would there be anything wrong with that?
 5   A. If they requested it, I wouldn't see a
 6      problem if they requested it.
 7   Q. Okay.  Isn't it a fact that a female was
 8      assigned to one of the dorms more than you
 9      were assigned to one of those four dorms in
10      what you call the problem area of A, B, D, or
11      G way before the complaint was ever filed by
12      Mr. McClease?
13   A. I think -- I don't know which -- which female
14      you're speaking of, but I know it's one
15      female had a permanent post on our shift.
16   Q. There are no such things as permanent posts,
17      are there?
18   A. By definition, they say it's no such thing as
19      a permanent post.
20   Q. Is there a permanent post on second shift?
21   A. Well, as of yesterday, it wasn't.
22   Q. How about the day before?
23   A. The day before, I'd say it was different.
```

Page 53

```
 1      And I believe --
 2   Q. Got anything to back up what you say, that
 3      there's a permanent post?
 4   A. I don't have anything with me.  I don't have
 5      anything with me.
 6   Q. Okay.  What about not with you that's in your
 7      possession?
 8   A. In my possession?
 9   Q. Yes, sir.
10   A. I can't say I have anything in my possession.
11   Q. Anything you've given to your lawyer?
12   A. Can't say that either.
13   Q. Okay.  But you would agree with me since way
14      before or at least since -- starting in I'm
15      starting in October of 2005.  There was a
16      female assigned to one of those dormitories
17      more than you were assigned to one of those
18      dormitories; isn't that correct?
19   A. To one of those dormitories?
20   Q. A, B, D, and G.  Mr. Jacobs, when I say to
21      one of those dormitories, I'm going by the
22      stuff that you put in your complaint.  Okay?
23   A. Well, I can put it like this, sir.  When you
```

Joel McClease, et al. vs. Alabama Department of Corrections                    5/24/2007
DEPOSITION OF MALCOMB JACOBS

17 (Pages 62 to 65)

Page 62

1     there, would you be willing to work in that
2     position?
3  A. Only if I was properly trained.
4  Q. And how would you get trained?  You would
5     have to work in there, wouldn't you?
6  A. On the -- I would have to work alongside
7     someone that's experienced in it.
8  Q. Or someone who knew how to do it?
9  A. Well, who knew about -- knew about the
10    paperwork, how to do the paperwork.
11 Q. And does a shift commander have that
12    responsibility of knowing how and what a
13    shift clerk does and the proper way to do it?
14       MR. LEWIS:  Object to the form.
15 A. Let me --
16       MR. LEWIS:  Go ahead.
17 Q. Can you answer that question?
18 A. Actually, to my understanding, a shift clerk
19    is a different classification, job
20    classification.  A clerk is ASA-I.  We are
21    CO-I's.
22 Q. And do you always -- has the Department
23    always been able to keep employed an ASA-I on

Page 63

1     your shift from this period of time of
2     October 2005 to the present date?
3  A. I've known -- I've noticed that it wasn't --
4     there was a high turnover in the -- in
5     that -- in that position.
6  Q. Okay.  And is that a position that is
7     important and has to be filled?
8        MR. LEWIS:  Object to the form.  If you
9        know, go ahead and answer.
10 A. I can't answer that question.  I mean, could
11    you rephrase it?
12 Q. Yes, sir, I'll try to.  Is that a function
13    that somebody has got to keep the records,
14    has got to keep the logs, has got to keep all
15    the stuff together on what happens during
16    that shift?  That's important, is it not?
17 A. Well, as you -- as you mentioned earlier, you
18    said the supervisor do -- knows more about
19    it.  So until they get that -- the
20    substitute, I feel that a supervisor should
21    take that position until they get that filled
22    in because --
23 Q. So a supervisor should quit being a

Page 64

1     supervisor and be a clerk?
2  A. Well, we have sergeants and we have
3     lieutenants, so we have --
4  Q. And they are, in fact, supervisors?
5  A. Basically.
6  Q. So you object to using an officer as a clerk?
7  A. Being that we need officers in dormitories
8     more so than in the office.  That's just my
9     opinion.
10 Q. Okay.  That's fine.  But experience would
11    matter.  That was our original question.
12 A. Experience would matter.  In that -- that
13    situation, I feel experience matters.
14 Q. And experience matters -- I mean, you
15    wouldn't want to take somebody absolutely
16    green out of the academy, male or female, and
17    throw them into a situation where an incident
18    could happen, would you?  I mean, he's got
19    the same training.  He makes the same pay, he
20    or she makes the same pay.  But would you
21    want to take them green, right straight out
22    of the academy, and throw them in a situation
23    where an incident can happen?

Page 65

1  A. Are you speaking of that particular job, or
2     you talking about just being an officer?
3     Could you clarify that?
4  Q. Yes, sir.  Yes, sir.
5  A. Rephrase it.
6  Q. I believe that you have, in your complaint,
7     claimed that there are four dorms that are
8     more dangerous than other areas in the
9     facility on your shift.  Those are dorms A,
10    B, D, and G.  Would you -- is it your opinion
11    that, male or female, an officer coming
12    straight out of the academy -- out of the
13    academy and being assigned as the first
14    assignment is at Staton on second shift, your
15    shift.  Would it be, in your opinion as an
16    experienced officer, proper to put that
17    person in dorm A, B, D, or G?
18 A. I'll just have to say it, put it like this.
19    Sometimes -- every officer complements the
20    other officers.  Some officers are good at
21    writing.  Some officers are good at
22    maintaining order in the dormitory.  Officers
23    complement each other.  So in that case, I

DEPOSITION OF MALCOMB JACOBS

18 (Pages 66 to 69)

|  | Page 66 |
|---|---|
| 1 | can't say yes or no, because this officer may |
| 2 | come out of the academy and do just as |
| 3 | good -- just as good a job as the one that's |
| 4 | been there all the time. |
| 5 | Q. Right. And that's kind of where we get into |
| 6 | demeanor and attitude and ability, is it not? |
| 7 | MR. LEWIS: Object to the form. |
| 8 | A. I just -- you got to kind of elaborate on the |
| 9 | question a little bit. Rephrase it. |
| 10 | Q. No. I'm asking you. Can you not answer that |
| 11 | question? |
| 12 | A. Repeat that again. |
| 13 | Q. Yes, sir. That's when ability, demeanor, and |
| 14 | attitude come into play, right? |
| 15 | A. Ability. |
| 16 | Q. Ability, demeanor, and attitude come into |
| 17 | play. |
| 18 | A. And in reference -- |
| 19 | Q. In reference to your previous answer, |
| 20 | Mr. Jacobs. You're saying that some people |
| 21 | can come straight out of the academy and be |
| 22 | just fine and be great. |
| 23 | A. Okay. Okay. |

|  | Page 67 |
|---|---|
| 1 | Q. But that's when attitude, ability, and |
| 2 | demeanor comes into play, is it not? |
| 3 | A. I would imagine it would. I'm assuming it |
| 4 | would. |
| 5 | Q. Thank you. Now, have you looked at these? |
| 6 | A. I went over it. |
| 7 | Q. And it shows even before the complaint was |
| 8 | filed by -- did you know that McClease had |
| 9 | filed a grievance in October or November? |
| 10 | A. I heard of it, but I didn't know the details. |
| 11 | Q. Who did you hear of it from? |
| 12 | A. It was just hearsay basically. |
| 13 | Q. Okay. You didn't hear it from McClease? |
| 14 | A. I didn't speak with Mr. McClease. |
| 15 | Q. Okay. But do the records reflect that a |
| 16 | female worked in at least one of those dorms |
| 17 | more than you worked in one of those dorms |
| 18 | over that -- this 19 months? |
| 19 | A. I'm not sure if it was one individual that |
| 20 | worked in a dorm that's listed. |
| 21 | Q. My question to you is this. Very, very |
| 22 | simple. Do the records reflect that a female |
| 23 | worked in one of those dorms more than you |

|  | Page 68 |
|---|---|
| 1 | worked in one of those dorms -- |
| 2 | A. According to the -- |
| 3 | Q. Can I finish my question, please? -- in one |
| 4 | of those dorms more than you worked in one of |
| 5 | those dorms over this 19-month period that |
| 6 | you have had a chance to look at? Yes or no? |
| 7 | A. According to those files, it -- it appears to |
| 8 | be, yes, sir. |
| 9 | Q. Okay. Thank you. Now, just so I'm |
| 10 | straight -- because I'm very confused; and |
| 11 | this is very, very important. Do you contend |
| 12 | that the assignment to dorm A is a more |
| 13 | dangerous assignment and that females are not |
| 14 | assigned there? Are you contending that? |
| 15 | Yes or no? Just strictly dorm A officer. |
| 16 | That's the only position I'm talking about. |
| 17 | Is that a contention of yours in this |
| 18 | lawsuit? Yes or no? |
| 19 | A. It had -- can I -- can I explain? Let me -- |
| 20 | I'm going to clarify my answer to that |
| 21 | question. Dorm A on those schedules in |
| 22 | writing, if that individual that's on there |
| 23 | is a female, that individual -- well, let me |

|  | Page 69 |
|---|---|
| 1 | put it like this. Since I've been there, |
| 2 | I've only noticed maybe once or twice a |
| 3 | female worked in that area. Because that's |
| 4 | where I always worked. That's -- that's what |
| 5 | I -- that's what I have observed since my |
| 6 | time being at -- at that institution. |
| 7 | Q. My question to you is -- it doesn't have |
| 8 | anything to do with females. |
| 9 | A. Okay. |
| 10 | Q. It has to do with what you're contending in |
| 11 | your lawsuit. |
| 12 | A. Okay. |
| 13 | Q. Are you contending in your lawsuit that |
| 14 | dorm A is a more dangerous assignment and |
| 15 | that females are not assigned there? Yes or |
| 16 | no? |
| 17 | A. Yes. |
| 18 | Q. What about dorm B, same question? |
| 19 | A. Yes. |
| 20 | Q. What about dorm D, same question? |
| 21 | A. D? Yes. |
| 22 | Q. What about dorm G? |
| 23 | A. G, yes. |

## DEPOSITION OF MALCOMB JACOBS

Page 70

1  Q.  What about rover A?
2  A.  Rover A, when he's in the dorm, he can be --
3      he's not -- he's not permanently in the dorm.
4      I'm speaking in terms of the dorm officers
5      who's actually in the dorms.
6  Q.  Well, I'm just trying to get it straight.
7      We're not talking about the dorm officers
8      now.  We're talking about rover A.  Do you --
9  A.  It's somewhat -- it's somewhat dangerous, not
10     as dangerous as being as a rover -- I mean,
11     as a dorm officer.
12 Q.  Okay.  Is it more dangerous than being a
13     rover or in any other position in the
14     facility that y'all have to cover, that
15     shifts have to cover?
16 A.  All of it is dangerous, sir.  All the areas
17     in the institution is dangerous, but the --
18     the -- the chances of a situation occurring
19     and you being isolated, the dorm officer
20     who's assigned to the dorm would be in a more
21     vulnerable position.
22 Q.  All I'm trying to determine, Mr. Jacobs, is,
23     is rover A --

Page 71

1  A.  Okay.
2  Q.  -- one of the positions that you're saying
3      that is more dangerous and that females are
4      not assigned there.  That's the question.
5  A.  It's potentially dangerous.  I'll agree that
6      it's dangerous.
7  Q.  My question is, do you contend in this
8      lawsuit that dorm A is more dangerous and
9      that females are not assigned there?
10         MR. LEWIS:  You mean rover?
11         MR. BUTLER:  Excuse me.  Thank you.
12         Thank you.
13 Q.  Rover A.
14 A.  I guess it's just as dangerous.
15 Q.  And are females not assigned there?
16 A.  As rovers?  I'm not saying that they're not
17     assigned as rovers.  I'm not saying they're
18     not assigned on paper as rovers.  What I'm --
19 Q.  So you're not saying that being assigned to a
20     rover A is not gender discrimination; you're
21     not claiming gender discrimination there.
22     And you're not claiming disparate treatment
23     there, that you're being treated differently

Page 72

1      than females if you're assigned to dorm A.
2      Is that what you're saying?
3          MR. LEWIS:  You mean rover A?
4          MR. BUTLER:  Did I say dorm A again?  I
5      apologize.
6  Q.  Rover A.  We're out of the dorms and into the
7      rovers now.  Okay?  And I apologize if I keep
8      saying that.
9  A.  I'm just trying to clarify.  I'm just trying
10     to get you to understand my answer to that
11     question.  I hear what you're saying; but I'm
12     saying what I know is that if it's on the
13     paper, it's not happening in reality.
14 Q.  What I'm trying to decide, whether it's on
15     the paper, not happening in reality,
16     whatever, are you contending in this lawsuit
17     that rover A is more dangerous and females
18     are not assigned there?  It's a simple
19     question, Mr. Jacobs.
20 A.  Is more dangerous than any other -- than --
21     it's more dangerous.
22 Q.  And are females -- are you contending that
23     females are not assigned to rover A?  Yes or

Page 73

1      no.  It's -- you got --
2  A.  Yes, I am saying that females are not
3      assigned in that area in that position.
4  Q.  All right.  Thank you.  How about rover B?
5      Same question.  Is it more dangerous, and are
6      you contending that females are not assigned
7      there?
8  A.  I'll have to clarify.  As I said, just as
9      rover A, rover B, if they are assigned --
10     like I said with A, let me clarify that
11     response from A.  If they're assigned there,
12     they're not working there.  But the post is
13     just as dangerous.  B and A are the same.
14     The posts are just the same.
15 Q.  Can you just answer my question yes or no?
16 A.  It's not a black and white.  I'm just trying
17     to --
18 Q.  It is when it's in your complaint.  What are
19     you contending?  What are you saying?
20 A.  I'm saying that --
21 Q.  It's a plain answer, Mr. Jacobs.
22 A.  Okay.
23 Q.  Very plain.

Joel McClease, et al. vs. Alabama Department of Corrections     5/24/2007
DEPOSITION OF MALCOMB JACOBS

20 (Pages 74 to 77)

Page 74

1  A. Okay. I'm saying that those areas are
2    dangerous and hardly ever females -- it's
3    rarely ever females working in those areas.
4  Q. I'm not talking about those areas. I'm
5    specifically --
6  A. Or that area.
7  Q. -- talking now about rover B. I'm sorry.
8    Specifically about rover B. Let's just take
9    one at a time so we can get this straight.
10 A. B dorm? B dorm.
11 Q. No. Rover B. Rover B.
12 A. Okay. Rover B is just as dangerous as rover
13    A. And hardly ever any females -- I never
14    see any females work those areas. That's
15    what I'm contending.
16 Q. In your lawsuit, it says females are not
17    assigned there. Is that what you're saying,
18    that females are not assigned to rover B?
19 A. I'm not saying they're not assigned on
20    paper. I'm saying they're not actually
21    working that area. That's what I'm saying.
22    I'm not saying the document may reflect
23    something different; but I'm saying in

Page 75

1    reality, that they're not working in those
2    areas.
3  Q. What evidence do you have that supports
4    they're not working in those areas?
5  A. I don't have it on my person, but I'm quite
6    sure the log will reflect, the logs -- the
7    shift logs, not those -- not those post
8    assignments. We have running logs in the
9    dormitories, which is not -- you don't
10    have -- that will reflect activities that
11    goes on that the dorm officer keep.
12 Q. So you're saying that -- and it's just --
13 A. If anybody come in the dorm --
14 Q. Let me see if I can get it better. I'm just
15    trying to find out what you're saying in your
16    lawsuit, Mr. Jacobs. That's all. Okay? It's
17    very simple. If you're assigned as a
18    rover in B -- okay?
19 A. Okay.
20 Q. -- do you contend that your assignment to
21    that position is gender discrimination,
22    disparate treatment -- let me finish --
23    because females are in fact not assigned to

Page 76

1    that position, rover B? Is that what you're
2    saying in your lawsuit? And that's either a
3    yes, I am saying that or, no, I'm not saying
4    that. I'm asking what you're saying in your
5    lawsuit.
6  A. I'm saying they are not -- you're saying
7    assigned. Assigned is the keyword. You're
8    trying -- you're trying to say assigned.
9    They are assigned. If they're -- according
10    to that -- that duty post, they may be
11    assigned on the duty post logs; but actually,
12    my experience in working down there, they
13    haven't worked the area.
14 Q. I'm just saying what your lawsuit says.
15    Okay?
16 A. They're not assigned. I'm saying if you want
17    to look at it from that standpoint, they're
18    not, in my mind, assigned because they're not
19    working down there.
20 Q. And if you were assigned down there, you
21    would not be working down there. Is that
22    what you're saying?
23 A. If I was not -- if I was assigned, then I'd

Page 77

1    be working down there because I've done it.
2  Q. And you're saying but the females --
3  A. The difference is when I'm assigned there, I
4    work it. When they're assigned there,
5    they're not working it.
6  Q. You don't do any special details as a rover?
7  A. I do special details as a rover.
8  Q. So you're not in there when you do special
9    details, are you?
10 A. Well, more so than not, I would be in that
11    area more so if I was instructed to go down
12    there, and which hardly ever the females get
13    instructed to remain in that area.
14 Q. Well, hardly ever is different from never.
15 A. Never. Never.
16 Q. Which one? Never?
17 A. Mostly never.
18 Q. Mostly never is different than never. Which
19    one is it?
20 A. Well, in my opinion, it's never.
21 Q. Okay. Do you have anything to support that
22    opinion or belief?
23 A. Do I have anything? A log, a running log.

Joel McClease, et al. vs. Alabama Department of Corrections                    5/24/2007
DEPOSITION OF MALCOMB JACOBS

26 (Pages 98 to 101)

Page 98

1   A. Actually, that's a supervisor here.
2   Q. Right. Working overtime, correct?
3   A. Right.
4   Q. And when supervisors work overtime, they work
5      in an officer status, do they not?
6   A. That's -- that's my understanding is they
7      work as an officer.
8   Q. And when it says B-1, that is another rover
9      for G dorm; isn't that correct?
10  A. I would have to disagree with that again.
11  Q. All right. Let's go to the next one. Go to
12     the next one.
13  A. Okay. You got the hospital again.
14  Q. Okay. And is that a dangerous dorm?
15  A. Well, not compared to the old A or B or the
16     new C or D in comparison, no.
17  Q. Is there a female working --
18  A. In my opinion.
19  Q. -- as a B dorm rover, which is the old G dorm
20     rover?
21  A. You talking about that B-1 again?
22  Q. Yeah.
23  A. That same individual is on the free world

Page 99

1      again.
2   Q. Working overtime?
3   A. Not in the institution. Free world mean in a
4      van riding with maybe one inmate in a cage.
5      That's what that is.
6   Q. The whole shift? Were you there? Were you
7      down there?
8   A. I'm just saying what this -- what this
9      indicates.
10  Q. Were you down there?
11  A. I was in -- at the hospital.
12  Q. Right.
13  A. I don't know. If I could go back through the
14     log to that date, maybe I could pull up the
15     log to see who was on transport that day. I
16     don't know. I can't -- I can't --
17  Q. But you don't have anything to disagree with
18     that, do you?
19  A. I can't -- I can't answer that.
20  Q. All right. Go to the next day.
21  A. They got it down as G again for the same.
22     These are the same dates. You got
23     March 12th, March 12th, March 12th. These

Page 100

1      are the same sheets.
2   Q. That's correct. Let's go to -- the next one
3      marked is the 16th, March the 16th. Where
4      are you assigned?
5   A. According to this, it's got tower 3.
6   Q. Well, do you disagree that you were assigned
7      in tower 3?
8   A. I guess I was assigned to tower. Based on
9      this -- this schedule, I was assigned to
10     tower.
11  Q. You signed in for that.
12  A. Okay.
13  Q. Was there a female working in one of the
14     dorms that you consider to be a dangerous
15     dorm?
16  A. According to the schedule, it's got her down
17     there, Ms. Bass in F, according to this
18     schedule.
19  Q. You got anything -- any evidence to support
20     that she was not in fact working there?
21  A. I don't have anything saying she was in it
22     either, sir.
23  Q. You got a log right in front of you saying

Page 101

1      she was in it.
2   A. I mean, I don't know for a fact, but
3      according to the log.
4   Q. Are you saying that the logs are mistaken?
5   A. I'm saying sometime that the logs don't
6      reflect the actual -- actual assignments.
7   Q. On this specific date, are you saying that
8      the logs --
9   A. I can't say on this specific day. No, I
10     can't say. According to this log, she's
11     assigned F dorm.
12  Q. Okay. Next yellow sticky. Yellow sticky.
13     What date is that?
14  A. It's the 20th.
15  Q. March the 20th?
16  A. March 20th.
17  Q. What does it reflect?
18  A. I'm in C dorm.
19  Q. Is that a dangerous dorm?
20  A. C dorm is -- well, no. Yes, C dorm is the
21     new A -- is the old B dorm. That's one of
22     the hostile areas.
23  Q. Okay. And you were assigned there. You

Joel McClease, et al. vs. Alabama Department of Corrections                5/24/2007
DEPOSITION OF MALCOMB JACOBS

28 (Pages 106 to 109)

Page 106

1    rover G of what you're contending.  Is
2    rover G one of the more dangerous dorms that
3    you're talking about --
4  A.  Yes.
5  Q.  -- in your complaint where females are not
6    assigned?  Is that correct?  Is that what
7    you're contending?
8  A.  That's what I'm saying.
9  Q.  Okay.  Good.  I won't belabor that.  I just
10   want to make sure I got it covered.  Now, you
11   heard Mr. McClease say yesterday that under
12   the term where we're dealing with terms of
13   employment, conditions of employment, and
14   privileges, Mr. McClease claimed that under
15   privileges that females are given higher
16   annual performance scores as a result of not
17   having to work the more dangerous dorms.  Do
18   you agree with that or disagree?
19 A.  I don't -- I haven't seen anybody's
20   evaluation.
21 Q.  That's in your lawsuit.  So what I'm asking,
22   is that part of your contention, yes or no?
23 A.  If it was in the lawsuit, I have to go along

Page 107

1    with it.
2  Q.  You have to go along with it, but do you
3    agree with it or disagree with it?
4  A.  That they're getting better evaluations than
5    we are?
6  Q.  Yes.
7  A.  I -- I -- I have to agree with it.
8  Q.  Okay.  What were you -- would that be true on
9    your shift?
10 A.  I would have to say so on our shift.
11 Q.  And what score did you get in 2005-2006?
12 A.  I don't have the papers in front of me.  I
13   can tell you it was -- it was exceeds
14   standards.
15 Q.  It was consistently exceeds standards.  It
16   was a score of 39 out of 40, was it not?
17   I've got it right here if you would like to
18   look at it.  It's the top one.
19 A.  Okay.
20 Q.  Is that correct?
21 A.  That's it, yes, sir.
22 Q.  And you might want to keep this other here.
23   Do you recall what score you got in

Page 108

1    2004-2005?
2  A.  I would have to look at the --
3  Q.  It's right there.  It's right under you.
4    That's a copy of your personnel file,
5    Mr. Jacobs.
6  A.  Right.  Same score.
7  Q.  Well, no.  Dig a little deeper.
8  A.  Dig a little deeper?
9        MR. LEWIS:  Did you say --
10       MR. BUTLER:  2004-2005.
11 Q.  What was the score?
12 A.  Same score, 39, according to this sheet.
13       MR. LEWIS:  That's --
14 A.  04-05.
15       MR. LEWIS:  04-05.
16 Q.  All right.  I'm sorry.  You are.  What about
17   03-04?
18 A.  03-04, 36.
19 Q.  Okay.  Which is what, exceeds standards?
20 A.  Right.
21 Q.  And then 03-04 was when you first came to
22   Staton; is that correct?
23 A.  03-04?  It was '04.  '04.

Page 109

1  Q.  During that grading period was when you
2    transferred from Bullock?
3  A.  That's correct.
4  Q.  And that year, you got a 36, which is exceeds
5    standards?
6  A.  Right.
7  Q.  Can you name me a female on your shift that's
8    got a better annual evaluation than you do?
9  A.  I haven't seen anybody's score.  I can't name
10   anybody.
11 Q.  So you can't give me a name of a female?
12 A.  I can't -- I can't -- I can't give a name of
13   anyone.
14 Q.  Yesterday you said that -- when I was asking
15   you specifically about mental anguish, that
16   it caused stress and that you had trouble
17   sleeping at night.  Is that what you said?
18 A.  Right.
19 Q.  Was that caused by your being assigned to
20   those dorms?
21 A.  I can't say what it's caused by.  All I can
22   do is tell you what -- what I go through when
23   I go home.

Joel McClease, et al. vs. Alabama Department of Corrections                5/24/2007
DEPOSITION OF MALCOMB JACOBS

29 (Pages 110 to 113)

Page 110

1  Q. And is that an every night occurrence?
2  A. I won't say every night. It just some --
3     like some days, if I have a day -- a
4     stressful day that day, it may be one of
5     those days.
6  Q. Okay. But specifically, do you have it after
7     you work in one of those dangerous dorms?
8  A. I can't just pinpoint when my body have --
9     you know, has its reactions to stress. I
10    just -- over a period of time, I've been
11    having -- you know, been up at night, you
12    know, sometime with stomach problems, you
13    know, stuff like that.
14 Q. You been to a doctor?
15 A. Not for that.
16 Q. Have you been to a doctor for something else?
17 A. I've been to an eye doctor, you know, medical
18    doctor.
19 Q. But you've not been to a doctor about stress?
20 A. The military, as far as that. As far as
21    stress, just -- no. Just a general physical,
22    nothing other than as a general physical.
23 Q. When you served in the military, where did

Page 111

1     you serve?
2  A. I was Stateside. I did Stateside duty. I
3     did -- it's National Guard Stateside duty.
4  Q. Where?
5  A. Oh, I went to Mississippi, did the
6     hurricane relief. I did a couple of trips
7     down in Panama. I've been to Germany before.
8  Q. Did that cause stress?
9  A. I was younger then. That was years ago.
10 Q. My question was, did that cause stress?
11 A. Not that I can recall during that time,
12    because that --
13 Q. Does this stress affect your ability to do
14    your job?
15 A. I can do my job. I'm just saying -- I'm just
16    saying what -- what I -- what I experienced.
17 Q. My question to you, does -- does this --
18 A. I feel that I can still do my job.
19 Q. Does this stress -- okay. You answered.
20    When you were talking about -- you said also
21    yesterday about compensation, your loss of
22    compensation. I believe you said something
23    about overtime.

Page 112

1  A. Mr. McClease said -- we was talking about in
2     comparison, the people that does overtime.
3     Some people, what I -- my way of putting it,
4     have to really grind for it. Some people
5     just get easy overtime, like post
6     assignments. It's easier to do overtime on a
7     tower than it would be in one of those
8     hostile areas. You're in a -- for example,
9     if you're in a dormitory with traffic, one of
10    those open dorms, those hostile areas, you
11    got constantly something going on. You got
12    to look out for this and look out for that,
13    as opposed to being in a tower, you have to
14    just watch the fence line and focus on that.
15    But you have to focus on people in your dorm,
16    around your dorm, in your base. You know,
17    you got so much going on.
18 Q. I believe what you told me yesterday -- and
19    you correct me if I'm wrong. I just want to
20    make this clear -- is that the loss of
21    compensation that you're claiming in your
22    lawsuit had to do with overtime. Is that
23    correct?

Page 113

1  A. I don't understand how you -- what you mean
2     by the loss of overtime.
3  Q. Well, you told me that you had a loss in
4     compensation; is that correct?
5  A. I don't recall telling you I had a loss in
6     compensation.
7  Q. Well, let me ask, then. Did you lose any
8     money as a result of what you're claiming the
9     Department discriminated against you?
10 A. Did I lose any money?
11 Q. Yes, sir.
12 A. I lost money in potentially doing overtime
13    because if I -- I figure if I do overtime, I
14    probably would be in a more hostile -- in
15    that sense, I would be in a more hostile area
16    opposed to being in a more -- less hostile
17    area to earn overtime. I'm losing in that
18    sense.
19 Q. That's exactly what I said earlier; but you
20    said no, you didn't say that. So you're
21    saying that --
22 A. I didn't understand your question.
23 Q. Okay. So you're saying now that your loss of

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                    NORTHERN DIVISION

4

5

6      JOEL McCLEASE, et al.,

7              Plaintiffs,

8      vs.                        CASE NO. 2:07-CV-019-MHT

9      ALABAMA DEPARTMENT
       OF CORRECTIONS,

10             Defendant.

11

12

13

14              * * * * * * * * * *

15          DEPOSITION OF WARDEN LEON FORNISS, taken

16      before Mallory M. Johnson, Court Reporter and

17      Commissioner for the State of Alabama at Large,

18      at the Alabama Department of Corrections, 301

19      South Ripley Street, Criminal Justice Building,

20      Montgomery, Alabama, on Thursday, May 24, 2007,

21      commencing at approximately 11:52 a.m.

22              * * * * * * * * * *

23

PLAINTIFF'S
EXHIBIT
#4
tabbies

1    A.   It's a form utilized by the third shift

2          commander to keep an idea of the post

3          assignments for the officers on his shift.

4    Q.   Okay.  Is that done in advance or in arrears?

5    A.   He projects it out in advance, but there's

6          situations that comes up that he can't

7          control.

8    Q.   Right.  But that particular chart there -- I

9          know he, obviously, makes the assignments in

10        advance.  When is that chart completed?

11        After the month is over?

12   A.   Probably corrected after the month is over to

13        show the actual, but it's probably projected

14        prior to that.

15   Q.   Okay.  Are those maintained for each shift?

16   A.   Yes.

17   Q.   So, if we wanted to get the personnel

18        rotation chart for every month from October

19        2005 up until the present time, we could do

20        that?

21   A.   I can't be for sure because we -- they may

22        have them, they may not have them; but

23        they're not necessarily required.  They just

1           grievance?

2    A.     Correct.

3    Q.     Okay.  What, if anything, did you do in

4           response to the memorandum in which

5           Mr. Hightower sustained the grievance?

6    A.     Gave specific instructions to all supervisors

7           to rotate the posts equally and equitably.

8    Q.     All right.  And to what extent did you check

9           to make sure they had done that?

10   A.     They e-mailed me mostly the rotation charts.

11          And I take a look at those just to kind of

12          get an idea.

13   Q.     All right.  And I'll represent to you the one

14          that I've given you is dated October 2006,

15          and it's the only one I have.  That's why I

16          was asking whether there are any others

17          available.  Let me show you one that I've

18          taken the liberty -- it's an exact copy, but

19          I've taken the liberty of highlighting.  And

20          I'll explain the highlighting to you for the

21          record.

22              I have marked each name with either a

23          pink for female or a yellow for male -- and

1        that's only because I didn't have a blue

2        one -- to reflect the gender of the

3        individual involved.  And if you will check

4        me on this, make sure I've gotten it right,

5        Sergeant Harris is female?

6  A.   Correct.

7  Q.   C. Johnson is female?

8  A.   Correct.

9  Q.   Lawrence is female?

10  A.   Correct.

11  Q.   Parker is female?

12  A.   Correct.

13  Q.   L. Richardson is female?

14  A.   Correct.

15  Q.   And Tiller is female?

16  A.   Correct.

17  Q.   And that is actually five Correctional

18        Officer I's and one supervisor.

19  A.   Yes.  At that time.

20  Q.   Okay.  And everybody else, if you will just

21        kind of glance down the list, those are all

22        males who are highlighted in yellow, correct?

23  A.   That's correct.

1   Q.   And what caught my attention was the fact

2        that we have designated -- and it may be

3        totally artificial; but we have designated as

4        the dangerous dorms at that time A, B, D, and

5        G.  And I'll ask you -- I'll get into whether

6        they really are or not later on.  And I went

7        down here on the right-hand column, and I

8        marked the number of times that each

9        individual had been assigned to one of those

10       dangerous dorms.  We're leaving Sergeant

11       Harris out because she's differently

12       situated, but let's see.

13          Bell, for example, a male, was assigned

14       eight times to one of those dorms.  Carter

15       was assigned four times.  Coleman, four

16       times.  Dismukes, none -- no.  Excuse me --

17       eight times.  I thought that was a zero.

18       Franks, five times.  Jiles, 12 times.

19          And then you come to C. Johnson, the

20       female, zero times.  J. Johnson, male, ten

21       times.  Kendrick, male, nine times.  Lamar, a

22       male, 19 times.  Then you come down to

23       Lawrence, who's a female, and we get zero

```
 1        times.   Longmire, 15 times.   McClease, five

 2        times.   Milledge, six times.   Miller, six

 3        times.   Moore, nine times.   Norman, 19

 4        times.   And then you come to Parker, who's

 5        the next female, one time.   Below her is

 6        Perkins, a male, 15 times.

 7             You come down to Richardson, three

 8        times, female Richardson.   Male, Richardson,

 9        eight times.   Shell was on leave.   Taylor, 15

10        times.   The next female, one time.   And then

11        your next three males, nine times, five times

12        and seven times.   And then Underwood, a male,

13        14 times.

14             Did I read that correctly upside down?

15   A.   According to the chart itself, yes.

16   Q.   Okay.   Looking at that chart, does that look

17        to you as if it were an equitable

18        distribution of assignments?

19   A.   Well, no.

20   Q.   Okay.   Tell me whether or not there are any

21        areas of the institution more dangerous or

22        for which the work is more stressful than

23        others.
```

1    Q.    In other words, if they're there, they ought

2          to be able to work all posts?

3    A.    Depends on their demonstrated experience and

4          ability to control their environment.

5    Q.    Okay.  Fair enough.  So, if they -- and just

6          so I understand this, if they -- if a female

7          officer has no demonstrated ability to

8          control the environment, are there places she

9          would not be assigned?

10   A.    No.  Because we want them to learn.

11   Q.    Okay.  So are there any officers who are not

12         assigned to specific areas at this point?

13   A.    Only if they're on light duty or something

14         like that.

15   Q.    Okay.  So what you're telling me is that the

16         degree of ability to control the environment

17         doesn't really control where they're put?

18   A.    No.

19   Q.    Because they're expected to learn it?

20   A.    That's true.

21   Q.    So, as far as you're concerned, everybody

22         ought to be able to work every post?

23   A.    Correct.

```
 1    Q.   And that decision is left up to the shift

 2         commander?

 3    A.   Shift commander.

 4    Q.   And that would be reflected on that log?

 5    A    That should be reflected on the log.

 6    Q.   So, we could look at the duty rosters and not

 7         everything -- not everything on it could be

 8         exactly correct?

 9    A.   Correct.

10    Q.   This would reflect where he was initially --

11    A.   Initially -- sorry.

12    Q.   -- initially assigned?

13    A.   Yes.

14    Q.   Okay.  Let's talk about these rovers for just

15         a minute.  So I can understand, what is a

16         rover?  A rover count, what does that mean?

17    A.   That's a split duty.  He may be assigned to a

18         rover; but when it comes to count, we have to

19         have two officers in each dormitory counting.

20         So he has to report to a particular area to

21         help assist with a count of a dormitory.

22    Q.   So he might be the A rover, but counting in a

23         different dormitory?
```

PLAINTIFF'S EXHIBIT #5
tabbies

## For the Month of OCTOBER- 2006 Personnel Rotation Chart Staton Third Shift

- female
- male

Legend:
Team Leader = TL   Tower 1 = T1
Asst. TL = AT       Tower 2 = T2
Tower 4 = T4
Tower 5 = T5
Dorm A-E = A-E
Trailers
Back Gate = BG
Annual Lea= aL
Holiday = HO
Military L=ML
ANNUAL IN LIEU OF SICK= aIs

| | 1 SU | 2 M | 3 T | 4 W | 5 TH | 6 F | 7 S | 8 SU | 9 M | 10 T | 11 W | 12 TH | 13 F | 14 S | 15 SU | 16 M | 17 TU | 18 W | 19 TH | 20 F | 21 S | 22 SU | 23 M | 24 T | 25 W | 26 TH | 27 F | 28 S | 29 SU | 30 M | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pittman | TL | TL | TL | AtI | AtI | AtI | TL | TL | AtI | AtI | AtI | AtI | TL | X | TL | TL | AtI | TL | AtI | TL | X | AtI | TL | TL | E | E | TL | TL | TL | TL | |
| J. Jackson | X | X | AtI | AtI | AtI | AtI | X | X | AtI | AtI | AtI | AtI | X | X | TL | X | AtI | TL | AtI | AtI | TL | AtI | E | E | E | E | E | E | H | H | |
| Harris | X | AtI | AtI | CK | AtI | X | TL | X | X | X | ED | X | TL | TL | X | X | AtI | AR | AtI | DR | AL | AL | AL | AL | AtI | C | C | AtI | X | X | |
| I Bell | AtI | DD | X | AD | DD | DD | X | TL | DD | DD | X | DD | HD | TI | TL | X | BD | AR | CD | AtI | X | X | AR | ED | ER | T5 | TI | TI | X | AD | |
| I Carter | CR | ER | Y | T5 | Y | TI | CD | X | ED | ED | T3 | DD | X | X | ER | ER | ER | X | T2 | DR | AR | CR | CD | CD | ED | DD | ER | AD | SL | AD | |
| I Coleman | DR | X | Y | Y | Y | X | X | M | C | X | X | C | C | C | X | X | CD | AD | T3 | HD | HD | AD | T4 | H | ED | T2 | SL | DR | X | X | |
| I Dismukes | AD | AR | X | X | X | X | AR | AR | X | X | X | AD | T3 | SL | T4 | BD | X | X | T2 | ED | CR | X | BD | X | X | AD | CD | AD | HD | AR | |
| I Frank | BR | X | BR | SL | T3 | T4 | CD | SL | T3 | AD | CR | TI | T4 | C | C | X | BR | T2 | IR | CD | ED | X | X | SL | SL | HL | SL | SL | CR | X | |
| I Jiles | X | AR | AR | HD | T5 | T4 | SL | T3 | DR | DR | X | AR | X | HD | GR | DD | X | BR | X | T4 | HD | BR | DR | HD | X | C | CD | CR | CR | BR | |
| I C. Johnson | CK | CK | CK | CK | CK | X | X | T3 | AD | CR | CK | CK | CK | X | CK | CK | CK | CK | CK | T4 | HD | DD | CK | SL | C | C | SL | X | SL | CK | X |
| I J. Johnson | DD | X | X | DD | X | T3 | DD | TI | ER | X | DD | HD | BR | DD | DD | AR | X | DD | DD | T3 | DD | IR | T2 | SL | X | T5 | T3 | X | CK | DR | |
| I Kendrick | IR | AD | T4 | X | T4 | T2 | AR | BD | DR | DR | DR | X | ED | T5 | AR | ED | AR | GD | AD | DR | GR | X | SL | C | X | GR | X | GR | GR | GR | |
| I Lamar | GD | GD | GR | GD | GD | X | SL | GR | GR | GR | GD | X | X | GD | GD | GD | AR | GD | GR | GR | HD | X | GD | GD | GD | BD | X | GD | GR | GD | |
| I Lawrence | HD | HD | T5 | GD | TI | X | C | C | C | HD | GD | X | X | GD | GD | HD | ED | ED | T5 | T5 | GR | T3 | ED | T5 | TI | T3 | X | X | HD | HD | |
| I Longmire | GR | X | T2 | TI | T2 | GR | GR | X | X | X | AD | T4 | GD | GR | GR | GR | GD | T4 | GR | GD | GR | GD | GR | GR | GD | GD | BR | GD | GD | ER | |
| I McClease | T3 | C | CD | SL | SL | X | X | T4 | CR | CR | HD | X | GD | AD | HD | T5 | ED | BR | IR | T5 | AD | GR | X | H | DD | DD | X | CD | CD | CD | |
| I Milledge | AR | BD | T3 | X | X | HD | CD | DD | ER | ER | X | CD | X | ED | T5 | TI | C | C | AD | X | DR | AD | HD | HD | X | T3 | HD | ED | T2 | BD | |
| I Miller | AL | AL | AL | AL | AL | T5 | TI | X | BD | BD | T2 | CD | X | X | TI | AR | T3 | BR | AD | BR | DR | T2 | T3 | BD | X | DD | X | ED | DR | T5 | |
| I Moore | T4 | TI | DR | DR | T5 | T2 | X | M | DR | BR | ER | ER | BR | BR | T2 | T2 | CR | CK | CR | X | CK | CK | T3 | T3 | CK | BD | CK | CK | BD | TI | |
| I Norman | X | GR | ER | GR | GD | GD | GD | X | GR | GR | GD | GD | MI | SL | X | X | GR | C | GR | GD | X | GR | GR | AD | AD | AD | GD | X | GR | GR | |
| I Parker | X | ED | CD | C | CR | CR | X | X | X | X | T4 | SL | C | SL | CR | CR | C | C | GR | GR | X | CR | CD | SL | T2 | T2 | GD | X | GR | ED | DR |
| I Perkins | X | SL | T4 | J | E | X | ED | HD | GD | GR | SL | GR | GR | SL | SL | SL | C | C | X | SL | SL | SL | SL | SL | SL | BD | ED | SL | T3 | HL | |
| I Richardson | T5 | | | J | | DF | AR | CD | AR | AR | X | IR | DD | T2 | BR | X | X | X | BR | AR | T2 | IR | C | SL | C | X | AR | T5 | X | DF | |
| . Richardson | CD | X | BD | X | EE | | | M | M | M | M | M | M | M | M | M | M | M | M | M | M | M | SL C | M | M | M | M | M | X | HL | |
| . Shell | M | X | TI | M | M | | | M | BD | BD | BD | X | M | M | X | X | BD | BD | BD | BD | X | X | SL C | M | BD | BD | C | M | X | DD | |
| OI Taylor | X | DD | HD | BD | BD | AD | AD | C | HD | HD | BD | X | BD | X | T2 | ED | AD | HD | HD | ED | C | AD | AD | X | GD | BD | X | BD | T1 | T2 | |
| I Tiller | ED | T2 | X | T3 | DF | X | X | ED | CR | ER | SL | BR | X | X | ED | X | HD | X | ED | BD | X | ED | X | SL | SL | SL | BD | X | ED | T3 | |
| I Tillman | T2 | X | AD | X | X | BD | T5 | AD | X | AR | X | ED | ED | X | CD | CR | X | DR | T4 | T4 | BR | CK | AD | X | X | CK | CK | X | AR | X | |
| I H. Thomas | BD | T4 | CR | AR | BR | ER | RD | T1 | T2 | IR | BR | CR | CR | CR | X | T5 | CR | T5 | DR | GD | CD | T3 | X | ER | M | BD | BD | X | X | T4 | |
| I Washington | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| I Underwood | ER | CR | X | X | | | | BR | X | CD | TI | DR | TI | AR | AD | X | CR | CR | CR | AR | T5 | DR | AR | T4 | T3 | AR | DD | AR | C | CR | |

## EMPLOYEE GRIEVANCE

Name Joel J McClease                     Date 10-17-05

Institution/Division Staton              Job Classification Corr officer I

Supervisor's Name LT. B Pittman          Section/Shift 3rd

Nature of Complaint Working female employees in certain area

Remedy Sought To work the same area as male employees

all Dorms

_Joel J McClease_
Signature of Complainant

If applicable, Reason for Late Filing of Grievance _____

| DATE FILED | DATE COMPLETED |
|---|---|
| Step 1: | Step 1: 10/17/2005 |
| Step 2: | Step 2: |
| Step 3: | Step 3: |

Decision at Step: Permanent Officers are assigned to Dorms A,B,D and G-Dorms
This leaves only Towers 1 thru 5 and E and C Dorms at present along
with Shift Clerk. Special Skills are required in order to Clerk.
As a matter of security we place those with certain Skills in Critical
areas.                                  10/17/2005          COSI

_Billy Pittman_                          Date              Title
Signature of Responder

ADOC Form 213 – January 24, 2005



**PLAINTIFF'S EXHIBIT**
#6

I tried writing a grievance but at step one I got retaliate against and it cost me money and a repriment. So that my reason for by-passing step 1+2. I also talk to Warden Thomas he seem to agree with Lt. Pittman This is not just happening on 3rd shift. Its all shifts.

AR206 – January 27, 2004

## HARASSMENT AND DISCRIMINATION
### Complaint Form

Name _Joel J McClease_     Date _11-23-05_

Institution/Division _Staton_     Job Classification _Corr Officer I_

Supervisor's Name _LT. Pittman_     Section/Shift _3rd_

Nature of complaint _Working female officers on certain post. Such as A + B + D Dorms not yard C, E, Tower, Hospital_

Remedy Sought _All of us are Correctional officer we all get hazardon duty Pay. Work the females the same post as we do._

_Joel J McClease CO I_
**Signature of Complainant**

| Date Filed | Date Completed |
|---|---|
| Step 1: | Step 1: |
| Step 2: | Step 2: |
| Step 3: | Step 3: |

Decision at Step: _____

_____

_____

_____

_____     _____     _____
Signature of Responder     Date     Title

PLAINTIFF'S EXHIBIT
#7
tabbies

ADOC Form 206
Revision Date: January 2004

6 of 6

AR206 – January 27, 2004



**BOB RILEY**
GOVERNOR

*State of Alabama*
*Alabama Department of Corrections*
301 S. Ripley Street
P. O. Box 301501
Montgomery, AL 36130



**RICHARD F. ALLEN**
COMMISSIONER

# M E M O R A N D U M

TO:    Joel McClease
       Correctional Officer I

FROM:  Roy Hightower, Institutional Coordinator

SUBJ:  Grievance # 05-72

DATE:  February 16, 2006

Your grievance was received in this office and has been evaluated. As you know, the Alabama Department of Corrections (ADOC) is firmly committed to providing a work environment that is free of discrimination. The ADOC maintains a strict policy prohibiting all forms of unlawful harassment, including sexual harassment.

After meeting with you at State Correctional Facility on January 30, 2006, and looking into this matter, I have made a determination in this case. The final decision within the ADOC is as follows:

**Basis for complaint:**
Officer McClease claims that female officers are only assigned certain posts. These posts are dorms C, E, towers and the hospital.

**Remedy sought:**
Officer McClease would like the female officers to work the same posts as the male officers.

**Facts:**
The record shows a difference in the post assignments of female officers. Female officers were assigned certain posts considered undesirable.

**Decision:**
All posts will be rotated, regardless of gender.



PLAINTIFF'S EXHIBIT #8

Page 2
        Grievance
Step III


Again, this decision is final within the ADOC.  We wish you continued success in your career within the Alabama Department of Corrections.  If you have any questions, please contact me at  (334) 353-3872.

RH/sb

cc:    Leon Forniss, Warden
       Kim Thomas, General Counsel